JAMI McDUFFY & others[1] *vs.* SECRETARY OF THE
EXECUTIVE OFFICE OF EDUCATION & others[2]
(and a companion case[3]).

Suffolk. February 2, 1993. - June 15, 1993.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ

*Constitutional Law*, Education, General Court. *General Court. Commonwealth*, Education, Financial matters.

Examination of the language and structure of Part II, c. 5, § 2, of the
Massachusetts Constitution, entitled "The Encouragement of Literature." [558-569]

Discussion of the history of public education in Massachusetts as it existed
at the time of the adoption of the Constitution of the Commonwealth in
1780. [569-577]

Examination of the views of those who framed and adopted Part II, c. 5,
§ 2, of the Massachusetts Constitution, entitled "The Encouragement
of Literature." [577-585]

Discussion of the statements and actions of legislators and executive officials ("magistrates") on the adoption of the Massachusetts Constitution
of 1780, with reference to their understanding of Part II, c. 5, § 2,
thereof as imposing on Legislatures and magistrates the duty to educate
the populace. [586-593]

Discussion of the early legislation of the Commonwealth putting into practice the intent of the framers of the Massachusetts Constitution with
respect to public education. [593-599]

---

[1]The plaintiffs are sixteen young people who live and attend public
school in Brockton, Belchertown, Berkley, Carver, Hanson, Holyoke,
Lawrence, Leicester, Lowell, Lynn, Rockland, Rowley, Salisbury, Springfield, Whitman, and Winchendon.

[2]The Board of Education, the Commissioner of Education, and the
Treasurer and Receiver General.

In addition, the plaintiffs sued the Governor. The Governor moved to
dismiss the case against him for lack of jurisdiction against him under
G. L. c. 231A (1990 ed.), and a single justice granted the motion. See
*Rice* v. *The Governor*, 207 Mass. 577, 580 (1911). Neither house of the
Legislature nor any member thereof has been joined as a party defendant.

[3]Jordan Levy & others *vs.* The Governor & others.

Discussion of the 1919 Report of the Special Commission on Education, with regard to the Commonwealth's financial support of public schools. [600-601]

The second section of Part II, c. 5, of the Massachusetts Constitution, entitled "The Encouragement of Literature," which provides that "it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the . . . public schools and grammar schools in the towns . . . ", is not merely hortatory or aspirational, but imposes instead an enforceable duty on the Commonwealth to ensure the education of its children in the public schools. [602-606]

Analysis of the statutory structure concerned with the assignment of various responsibilities related to public education, including the public school funding scheme. [607-614]

In actions for declaratory relief commenced by students in the public schools of various cities and towns, this court, although not determining that equal expenditure per pupil is mandated or required, concluded that the stipulated record established that the Commonwealth was not providing to children in less affluent communities the education to which Part II, c. 5, § 2, of the Massachusetts Constitution entitled them. [614-617] O'CONNOR, J., concurring in part and dissenting in part, was of the view that the record did not establish that the Commonwealth had failed to provide public education in compliance with the constitutional mandate.

Statement of broad guidelines for determining whether the Commonwealth has remedied violations of its duty imposed by Part II, c. 5, § 2, of the Massachusetts Constitution to assure the education of its children in the public schools. [618-621]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 9, 1978.

CIVIL ACTION commenced in the Superior Court Department on March 15, 1989.

Proceedings under the first seven counts of the complaint in the second case were ordered transferred to the Supreme Judicial Court for the county of Suffolk by *Abrams*, J., and the two cases were reported by her on a stipulation of agreed facts.

*Michael D. Weisman* (*Sara Miron Bloom, Mark A. Simonoff, Alan J. Rom, Richard W. Murphy & Michelle A. Allaire* with him) for the plaintiffs.

*Douglas H. Wilkins*, Assistant Attorney General (*Mary C. Connaughton*, Assistant Attorney General, & *Robert H. Blumenthal*, Special Assistant Attorney General, with him) for the defendants.

The following submitted briefs for amici curiae:

*Paul A. Minorini & Steven J. Routh*, of the District of Columbia, *Helen Hershkoff*, of New York, & *John Reinstein* for Civil Liberties Union of Massachusetts & others.

*Henry C. Dinger & Barbara Healy Smith* for Massachusetts Business Alliance for Education & others.

*Scott P. Lewis & Wendy J. Bookstein* for Jonathan Kozol.

*Stephen J. Finnegan & Michael J. Long* for Massachusetts Association of School Committees, Inc., & another.

*David Lee Turner,* Town Counsel, for town of Brookline.

*Robert Pressman* for Center for Law & Education & another.

*Naomi R. Stonberg & Linda Thomas Lowe* for School Committee of Gloucester & another.

*Jeffrey W. Jacobsen* for Massachusetts Federation of Teachers, AFT, AFL-CIO.

*Michael B. Rosen* for Trustees of Boston University.

*Roger L. Rice* for Padres Unidos en Educación y el Desarrollo de Otros & others.

*Charlotte Ryan*, pro se.

*Dr. Peter L. Frangipane* for Lynn Citizens Coalition for Public Education.

LIACOS, C.J. The Constitution of this Commonwealth, adopted by the people, provides:

> "Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of

them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of this country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humour, and all social affections, and generous sentiments among the people."

Part II, c. 5, § 2, of the Massachusetts Constitution.

In this case, sixteen students of the Commonwealth's public schools in sixteen different towns and cities of the Commonwealth sued the Board of Education, the Commissioner of Education, the Secretary of the Executive Office of Education, and the Treasurer and Receiver General, seeking a declaration of rights under G. L. c. 231A (1990 ed.) that the Commonwealth has failed to fulfil its duty to provide them an education as mandated by the Constitution. The plaintiffs claim that the State's school-financing system effectively denies them the opportunity to receive an adequate education in the public schools in their communities. This denial of the opportunity for an adequate education, the plaintiffs claim, violates both Part II, c. 5, § 2, and arts. 1 and 10 of the Declaration of Rights of the Massachusetts Constitution.

I

Initially, suit was commenced in May, 1978, under the caption Webby vs. Dukakis, by the filing of a complaint and a motion for class certification in the Supreme Judicial Court for the county of Suffolk. Shortly thereafter, the Legislature enacted "School Funds and State Aid for Public Schools," St. 1978, c. 367 § 70C (codified at G. L. c. 70). Following that legislative enactment, the case was inactive for five years, until 1983, when the parties initiated discovery. In July, 1985, a single justice of this court referred the case to a

master with orders to hear the evidence and to make findings of fact and conclusions of law. However, that same month the Legislature enacted "An Act improving the public schools of the Commonwealth," see St. 1985, c. 188, § 12 (codified at G. L. c. 70A), and proceedings in the case were again suspended. Five years later, in 1990, the plaintiffs filed a "restated complaint" (presently before us) and a renewed motion for class certification. In October, 1991, the parties filed a stipulation of agreed facts, and, in November, 1992, they filed a supplemental stipulation of agreed facts along with a joint appendix to the stipulations consisting of six volumes of documents.

In 1989, a separate suit, captioned Levy *vs.* Dukakis, was filed in the Superior Court Department in Worcester County. The first seven counts of the complaint in the Levy case consist of claims by nine young people who live in and attend public schools in Worcester, Carver, Revere, and Rockland, against various State education officials and institutions challenging the constitutionality of the State's school-financing system.[4] In May, 1990, the single justice in the present case, McDuffy *vs.* Robertson, issued an order transferring the first seven counts of the Levy complaint from the Worcester Superior Court to the Supreme Judicial Court for Suffolk County "for disposition." G. L. c. 211, § 4A (1990 ed.).

In December, 1992, a single justice reserved and reported both the McDuffy case and the Levy case without decision to the full court on the stipulated record. The parties filed briefs in this court and the court heard oral argument.[5,6]

---

[4] The plaintiffs through their next friends sued, among others, the Governor, the Department of Education, the Commissioner of Education, the Treasurer and Receiver General, and the Board of Education. They sought a declaratory judgment that the present system of financing public education fails to provide each student with an equal educational opportunity, and that the system therefore violates both the Massachusetts and the Federal Constitutions. We dismiss the claim against the Governor. G. L. c. 231A, § 2. See note 2, *supra.*

[5] The Levy plaintiffs have adopted the brief and record of the McDuffy plaintiffs and agree that the court's decision "will almost certainly" be dispositive of their claims.

[6] We gratefully acknowledge the briefs of the amici curiae: Gloucester

## II

The plaintiffs challenge the constitutionality of the entire school-financing scheme in the Commonwealth.[7] The plaintiffs fail, however, to specify either in their complaint or their brief any particular financing statute which they seek to have us declare unconstitutional. As will be briefly shown in this opinion, the school-financing scheme provides a complex, and frequently changing, mixture of State and local funding, together with a minor amount of Federal aid. It appears the plaintiffs seek to have us declare the entire financing scheme unconstitutional. We shall decline the invitation to engage in such a blunderbuss approach. Instead, we shall restrict ourselves to a determination whether the constitutional language of Part II, c. 5, § 2, is merely hortatory or aspirational, or

Public Schools and Wellesley Public Schools; Jonathan Kozol; Center for Law and Education and Massachusetts Advocacy Center; Padres Unidos en Educación y el Desarrollo de Otros (Parents United in Education and the Development of Others), Boston Latino Parents Association, Bilingual Master Parents Advisory Council of the Boston Public Schools, Chelsea Commission on Hispanic Affairs, Lynn Hispanic Parents Advisory Council, Massachusetts Association for Bilingual Education, Chinese Progressive Association, and Lawrence Hispanic Parents Advisory Council; Trustees of Boston University, on behalf of the Chelsea Public Schools; Massachusetts Federation of Teachers, AFT, AFL-CIO; town of Brookline; Civil Liberties Union of Massachusetts, American Civil Liberties Union, and Massachusetts Teachers Association; Massachusetts Business Alliance for Education, Massachusetts AFL-CIO, League of Women Voters of Massachusetts, Council for Fair School Finance, American Association of University Women of Massachusetts, Massachusetts Federation of Business and Professional Women, Inc., American Jewish Congress — New England Region, Citywide Educational Coalition, Citywide Parents Council, Greater Boston Civil Rights Coalition, Arlington Street Church Education Task Force, Citizens for Public Schools, Hispanic Office of Planning and Education, Latino Parents Association, Chelsea Parents Council for Special Needs Students, Choice Through Education, Inc., and Freedom House; Lynn Citizens Coalition for Public Education; Charlotte Ryan; and Massachusetts Association of School Committees, Inc., and Massachusetts Association of School Superintendents, Inc.

[7]They join similar groups of plaintiffs in at least twenty-eight States that have challenged school financing schemes on State and Federal constitutional grounds. See generally Strickland, The School Finance Reform Movement, A History and Prognosis: Will Massachusetts Join the Third Wave of Reform?, 32 B.C.L. Rev. 1105, 1109 (1991).

imposes instead a constitutional duty on the Commonwealth to ensure the education of its children in the public schools.

We conclude that a duty exists. Second, we shall attempt to describe the nature of that duty and where it lies. Third, we shall consider whether on this record such a duty is shown to be violated. We take this approach because we are confident that the executive and legislative branches of government will respond appropriately to meet their constitutional responsibilities.[8]

The stipulated record contains 546 stipulations and six volumes of documentary material. The plaintiffs claim that this record supports their factual assertions, and that these facts, taken together, are sufficient to prove their legal claim that the school-financing scheme in Massachusetts violates Part II, c. 5, § 2, and arts. 1 and 10. The defendant education officials dispute both contentions: They deny that the stipulated record supports the plaintiffs' factual claims, and they argue that, even if it did, these facts would be insufficient to prove the plaintiffs' legal claims. The defendants also

---

[8] We note that both parties engage in a clash of views that focuses on whether the constitutional language requires an "adequate" education, whether the State provides an education which is "adequate," and if not, who is to blame. We decline to enter into this aspect of the debate. To us the words "adequate" and "education" can be viewed as redundant as well as contradictory. E.H. Filene, a noted businessman, has stated: "When a man's education is finished, he is finished." Mark Twain (Samuel Clemens) once stated: "I have never let my schooling interfere with my education." The American Heritage (Electronic) Dictionary defines "education" as "the knowledge or skills obtained," and "adequate" as either "able to satisfy a requirement" or "barely satisfactory; mediocre." Synonyms for adequate (Roget's II Electronic Thesaurus) are: "sufficient," "satisfactory," "competent," or "enough." Synonyms for "education" range from "science" to "knowledge" to "erudition."

The word "adequate" does not appear in the constitutional language and the struggle of the parties reveals, with good faith on all sides, necessary biases as to meaning. Thus, we strive to ascertain, as we should, the intention of the drafters of the constitutional language and to provide a frame of reference for the implementation of that intent in a modern society.

Last, who is to "blame" between local governments or the Commonwealth appears to us to be totally irrelevant to the difficult questions put before us. We use the word "adequate" only to state the parties' arguments.

dispute the existence of the plaintiffs' legal claims under the Massachusetts Constitution. We outline briefly the plaintiffs' claims.

1. *The plaintiffs' factual claims.* The plaintiffs' key factual assertions concern: (1) the inadequacy of the education offered at the public schools they attend; (2) the insufficiency of funds for their schools; and (3) the State's school-funding system.

a. *Adequacy.* The plaintiffs assert that the educational opportunities offered to them in the towns and cities in which they live and attend public school are "inadequate." They assert further that "the education provided to the Plaintiffs is inadequate by any reasonable standard of adequacy." To support this inadequacy claim, the plaintiffs cite reports and affidavits of education professionals on the question of adequacy, and, in addition, using stipulations of record, they describe conditions in the plaintiffs' schools, and then compare them with conditions in three "comparison" communities (Brookline, Concord, and Wellesley). Among the reports which the plaintiffs cite to support their claim of inadequacy is a 1991 report of the Board of Education (one of the defendants). This report states that "schools in the Commonwealth of Massachusetts are in a state of emergency due to grossly inadequate financial support," and that the education offered in the public schools in some cities and towns of the Commonwealth is not "adequate" or "acceptable."[9] The plaintiffs also cite the affidavits of three education professionals: Harold Raynolds, former Commissioner of Education; Peter Finn, executive director of the Massachusetts Association of School Superintendents; and Rosanne K. Bacon, former president of the Massachusetts Teachers Association.[10] Each of these education professionals expresses the opinion that the education offered in the poorer towns and cities of

[9]See A Policy Position on Distressed School Systems and School Reform (Nov. 26, 1991); Report of the Committee on Distressed School Systems and School Reform (Nov. 26, 1991).

[10]The plaintiffs also refer to the affidavit of Robert I. Sperber, professor of education at Boston University.

the Commonwealth is inadequate.[11] Lastly, the plaintiffs cite a 1991 report of the Massachusetts Business Alliance for Education, a group of business persons concerned with education reform in the Commonwealth, which concludes that the "public education system is failing to provide its students with the knowledge and skills necessary for them to be productive, informed citizens in coming decades."[12]

In describing the conditions in the plaintiffs' schools, the plaintiffs focus mainly on four of the sixteen towns and cities in which they live and attend school: Brockton, Winchendon, Leicester, and Lowell. The parties have stipulated that the conditions in the schools in these communities are "sufficiently typical" of those in the schools in the other twelve communities, and that whatever findings the court makes for these four cities or towns should also apply to the other twelve. The parties also have stipulated that "evidence of the conditions in the school districts in which the plaintiffs attend school is sufficient to establish the conditions under which the plaintiffs attend school." In describing the conditions in the schools of these four communities, the plaintiffs cite extensive stipulations in the record, including stipulations describing the opinions of the superintendents of those four school systems on the adequacy of the education offered in their schools.[13] The plaintiffs also cite stipulations concerning:

---

[11]Mr. Raynolds states: "The purpose of public education is to provide every single child with an opportunity for success in learning. In many of the communities in Massachusetts, particularly less affluent communities such as the ones in which the plaintiffs attend school, Massachusetts is failing — and failing more than ever before — to achieve this goal." Mr. Finn states that "the education now offered in many of the poor communities, including the communities in which the plaintiffs attend school, is inadequate." Similarly, Ms. Bacon states: "In my opinion, it is also clear that the education now offered in many of the poor communities is inadequate."

[12]Every Child A Winner!: A Proposal for a Legislative Action Plan for Systemic Reform of Massachusetts' Public Primary and Secondary Education System, Massachusetts Business Alliance for Education (July, 1991).

[13]The parties have stipulated, for example, that the superintendent of the Brockton public schools is of the opinion that "as a result of the financial constraints under which the Brockton Public Schools are operating,

crowded classes; reductions in staff; inadequate teaching of basic subjects including reading, writing, science, social studies, mathematics, computers, and other areas; neglected libraries; the inability to attract and retain high quality teachers; the lack of teacher training; the lack of curriculum development; the lack of predictable funding; the administrative reductions; and inadequate guidance counseling.

the Brockton Public Schools are unable to provide the programs, services and personnel that are necessary to meet the needs of its students"; that "due to fiscal constraints Brockton is not adequately teaching its students to read"; that "shortcomings in the history and social studies programs in the Brockton public schools . . . have severely undercut the system's capacity to educate its students to understand the society in which they live and to help students become enlightened participants in the democratic process as they become adults" and that "[a]bsent such preparation . . . .the education provided in the Brockton public schools is inadequate"; and that the school system has "inadequate services" to meet the needs of the 155 children in the system who are in foster care or who are wards of the State, as well as those of the forty-three homeless children in the school system.

The parties have also stipulated that the superintendent of the Leicester public schools is of the opinion that "as a result of the fiscal constraints and uncertainties under which the Leicester school system operates, the Leicester public school system does not provide an adequate education to its students"; that class sizes in the third, fourth, and fifth grades in Leicester are "too large to provide the amount of individual attention and instruction needed by elementary students"; that guidance services in the schools "are inadequate and seriously jeopardize the future of [Leicester's] students"; that administrative support and management are "inadequate"; and that "most of the Leicester schools are in a terrible condition and that the high school is an extremely unsafe building."

Similarly, the parties stipulated to the opinion of the superintendent of the Lowell public schools that class sizes in Lowell are "too large for teachers to be effective with elementary level students"; that the "low level of guidance offered in the Lowell public schools is inadequate to meet the needs of even an average suburban system, let alone the extreme needs of a system such as Lowell, with its unusually diverse population and large percentage of at-risk students."

Lastly, the parties stipulated that the superintendent of the Winchendon public schools is of the opinion that Winchendon "tends to end up with inexperienced and poor quality teachers"; that "there are not enough offerings for advanced students"; that "the science facilities are also poor, the textbooks are outdated and the middle school labs antiquated" and that "Winchendon is unable to provide an adequate science education for today's world to its students."

The record also contains extensive stipulations concerning the conditions in the public schools in three "comparison" school districts: Brookline, Concord, and Wellesley. The parties have stipulated that the public school systems in these three communities are "typical of a significant number of the cities and towns in which the per pupil expenditure is in the top 25% of the Commonwealth." They have stipulated that the public schools in these "comparison" communities offer "significantly greater educational opportunities than the public schools in the communities in which the plaintiffs attend school," and that the latter offer "significantly fewer educational opportunities and lower educational quality than" the schools in the comparison districts. Further, they have stipulated that the "amount of financial resources" available to the comparison communities "is a significant contributing factor that affects the quality of the education that these communities are able to provide to their students, as compared to the plaintiffs' communities."[14]

With this introduction, the plaintiffs proceed, again relying on stipulations, to describe features of the school systems in the comparison districts, specifically: multi-faceted reading programs; extensive writing programs and resources; thorough computer instruction; active curriculum development and review ensuring a comprehensive and up-to-date curriculum; extensive teacher training and development; comprehensive system-wide student services; and a wide variety of courses in visual and performing arts.

b. *Funding levels.* The plaintiffs claim that the financial resources of the public schools in their towns and cities are substantially less than the financial resources of public schools in other towns and cities of the Commonwealth. They also claim that financial resources of the schools in their communities are so low as to render their schools unable to

---

[14]This stipulation contains the following proviso: "except that the parties do not agree as to whether this statement is applicable to Salisbury, Rockland, Worcester and Rowley."

provide students "with the opportunity to receive an adequate education."

c. *The school financing system.* The plaintiffs claim that the school funding system — "a conglomeration of statutes, occasional emergency legislation, local appropriations, and ad hoc practices not codified by statute" fails to ensure that the schools in the plaintiffs' towns and cities have sufficient funds to provide an adequate education. The financing "system," the plaintiffs claim, is responsible both for the wide disparity in funding among the schools in different communities of the Commonwealth, and for the insufficiency of school funds in the towns and cities in which they live and attend school.

According to the plaintiffs, there are several, interrelated problems with the school funding system: First, under the existing "system," the principal source of funds for public schools is local funds, primarily the local real property tax, which is assessed, collected, and used locally. Towns and cities with low real estate valuations, such as those in which the plaintiffs live and attend school, are severely limited in their ability to raise local funds. Second, there is no State statute or regulation requiring towns and cities to contribute any particular amount, percentage of local funds, or any local funds to the support of schools in their communities. Third, although the Commonwealth provides various forms of "State aid" annually to towns and cities under G. L. c. 70 and 70A, to supplement funds raised locally, the amounts granted are insufficient to compensate for deficiencies in local funds. Fourth, State aid is unpredictable every year and, in some years, is not granted by the State until after the school year has begun. Fifth, State aid for schools is undifferentiated from State aid for other municipal purposes, and there is no requirement that towns and cities actually use State aid for schools to support schools and not for other municipal purposes.

2. *The plaintiffs' legal claims.* On the basis of these factual assertions, the plaintiffs claim that the Commonwealth, through its school-financing system, has effectively denied

the plaintiffs the opportunity to receive an adequate education. The Commonwealth's failure to provide them with an adequate education, they claim, violates the duty imposed on the Commonwealth by Part II, c. 5, § 2, of the Massachusetts Constitution, which provides, inter alia, that "it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish . . . the public schools and grammar schools in the towns." The plaintiffs also claim that the failure to provide them with an adequate education violates the equal protection guarantees of arts. 1 and 10.

The plaintiffs seek identical relief under both of their constitutional claims:[15] a declaratory judgment that "the Commonwealth has an obligation to provide each public school child with the opportunity to receive an adequate education," and that "the Commonwealth has violated the Massachusetts Constitution by failing to fulfill its obligations to the Plaintiff school children." In addition, in their complaint (but not in their briefs), the plaintiffs ask the court to declare "that the Massachusetts system of financing elementary and secondary public education violates both the Education Clause and the Equal Protection Clause of the Massachusetts Constitution" and, following such declaration, to "[e]njoin any act by any of the defendants to continue to implement the current unconstitutional scheme of financing." As noted, we shall decline to reach these two latter points. We add also that in light of the failure of the plaintiffs to brief adequately which financial schemes are involved in these prayers, these issues are waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

We note that the plaintiffs do not seek a judgment that the Commonwealth has an obligation to equalize educational spending across all towns and cities, or that the Commonwealth has an obligation to provide equal educational opportunities to all its students. Instead, they seek a declaratory judgment that these constitutional provisions require the

[15]In the view we take of Part II, c. 5, § 2, we need not decide the equal protection issue.

State to provide every young person in the Commonwealth with an "adequate" education. The plaintiffs argue that Part II, c. 5, § 2, and arts. 1 and 10, each require "equal access to an adequate education, not absolute equality."

We turn now to an examination of Part II, c. 5, § 2, of the Massachusetts Constitution to determine whether, as the plaintiffs claim, its provisions impose on the State an enforceable obligation to provide to each young person in the Commonwealth the opportunity for an education.

## III

### A.

"The Constitution of Massachusetts is a frame of government for a sovereign power. It was designed by its framers and accepted by the people as an enduring instrument, so comprehensive and general in its terms that a free, intelligent and moral body of citizens might govern themselves under its beneficent provisions through radical changes in social, economic and industrial conditions. It declares only fundamental principles as to the form of government and the mode in which it shall be exercised." *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 570-571 (1970), quoting *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 523-524 (1917).

In determining the meaning of a constitutional provision, we look to the language and structure of the provision, so that it is "construed so as to accomplish a reasonable result and to achieve its dominating purpose." *Lincoln* v. *Secretary of the Commonwealth*, 326 Mass. 313, 317 (1950). See *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 541 (1988). We do so bearing in mind the Constitution was "written to be understood by the voters to whom it was submitted for approval. It is to be interpreted in the sense most obvious to the common intelligence. Its phrases are to be read and construed according to the familiar and approved usage of the language." *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 199 (1976), quoting *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365, 366 (1931). The words of a constitutional provision "are to be given their natural and ob-

vious sense according to common and approved usage as the time of its adoption." *Opinion of the Justices*, 308 Mass. 601, 611 (1941), quoting *General Outdoor Advertising Co.* v. *Department of Pub. Works*, 289 Mass. 149, 158 (1935).

Moreover, the Constitution "is to be interpreted in the light of the conditions under which it and its several parts were framed, the ends which it was designed to accomplish, the benefits which it was expected to confer, and the evils which it was hoped to remedy." *Cohen* v. *Attorney Gen.*, *supra* at 571, quoting *Tax Comm'r* v. *Putnam*, *supra* at 523-524. The Constitution "is to be construed in the light of the circumstances under which it was framed, the causes leading to its adoption, the imperfections hoped to be remedied, and the ends designed to be accomplished." *General Outdoor Advertising Co.* v. *Department of Pub. Works*, *supra* at 158.

Lastly, the Constitution "is a statement of general principles and not a specification of details. . . . It is to be interpreted as the Constitution of a State and not as a statute or an ordinary piece of legislation. Its words must be given a construction adapted to carry into effect its purpose." *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 571 (1970), quoting *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 523-524 (1917).

## B.

Part II, c. 5, § 2, of the Massachusetts Constitution was adopted as part of the Constitution of the Commonwealth in 1780. We repeat the part relevant to this case.

> "*Wisdom and knowledge*, as well as virtue, diffused generally among the body of the people, *being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education* in the various parts of the country, and among the different orders of the people, *it shall be the duty of legislatures and magistrates*, in all future periods of this Commonwealth, *to cherish the interests of literature and the sciences*, and all seminaries of them; *especially the* university at Cambridge, *public*

*schools and grammar schools in the towns . . .*" (emphasis supplied).

The plaintiffs argue that "the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish . . . public schools and grammar schools in the towns" includes the duty to provide an adequate education to the young people of the State, and that this duty is "an enforceable obligation" of the Commonwealth. The defendant education officials argue that the language of the entire section is "aspirational" and a "noble expression of the high esteem in which the framers held education," but that it is not "mandatory."

We begin with the language and structure of the provision. We seek the "natural and obvious sense" of the terms of the provision "according to common and approved usage at the time of [the Constitution's] adoption" in 1780. *Opinion of the Justices,* 308 Mass. 601, 611 (1941), quoting *General Outdoor Advertising Co., supra* at 158. Part II, c. 5, § 2, opens with two declarations, or statements, and then proceeds to establish the "duty . . . to cherish the . . . public schools." First, it declares that "[w]isdom and knowledge, as well as virtue, diffused generally among the body of the people" are "necessary for the preservation of [the people's] rights and liberties." Second, it states that the diffusion of wisdom, knowledge, and virtue among the body of the people "depend[s] on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people." Following these two declarations, the section provides that "it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially . . . public schools and grammar schools in the towns."

The two statements at the beginning of Part II, c. 5, § 2, state plainly the premises on which the duty is established: First, the protection of rights and liberties requires the diffusion of wisdom, knowledge, and virtue throughout the people.

Second, the means of diffusing these qualities and attributes among the people is to spread the opportunities and advantages of education throughout the Commonwealth. In the statement of these two premises for which the duty is established it is revealed that: The duty is established so that the rights and liberties of the people will be preserved. The immediate purpose of the establishment of the duty is the spreading of the opportunities and advantages of education throughout the people; the ultimate end is the preservation of rights and liberties. Put otherwise, an educated people is viewed as essential to the preservation of the entire constitutional plan: a free, sovereign, constitutional democratic State.

The language of the section makes clear the connection between the opening declarations and the duty which follows: "*[A]s* these [wisdom, knowledge, and virtue, diffused among the people] *depend on* spreading the opportunities and advantages of education . . . it *shall be* the duty of legislatures and magistrates . . . to *cherish* . . . public schools" (emphasis added). From the context, it is clear that "as" is used to mean "because," and that there is a clear causal chain connecting the two statements and the establishment of the duty. The language of Part II, c. 5, § 2, thus leaves little doubt about the reasons for which the duty to cherish is established.

The duty established is, inter alia, placed on the "legislatures and magistrates, in all future periods of this Commonwealth."[16] The common meaning of "duty" in 1780, accord-

---

[16]It is clear that the term "legislatures" refers to the Senate and the House of Representatives. See Part II, c. 1, § 1, art. 1 ("The department of legislation shall be formed by two branches, a Senate and House of Representatives . . . . The legislative body . . . shall be stiled, THE GENERAL COURT OF MASSACHUSETTS").

It is clear also that the term "magistrates" refers to officials of the executive branch. See Part II, c. 2, § 1, art. 2, of the Massachusetts Constitution ("There shall be a supreme executive Magistrate, who shall be styled, THE GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS"). The term "magistrates" is also used to refer to members of the judicial branch. See, e.g., *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803). In addition, the term can be used broadly to refer to members of each of the three branches of government. See art. 5 of the Massachusetts

ing to a dictionary of the English language published that year, was "that to which a man is by any natural or legal obligation bound." T. Sheridan, A General Dictionary of the English Language (1780) (Scolar Press, facsimile ed. 1967). "[I]n the sense most obvious to the common intelligence," *Buckley* v. *Secretary of the Commonwealth, supra* at 199, both then and now, a duty is that to which one is bound, or an "obligation."

The term "cherish" was used in the Eighteenth Century to import a meaning which is no longer, or which is much less, in vogue today. The meaning attached to the word then was "to support," "to nourish" or "to nurture." A host of dictionaries published in that era define the verb to "cherish" this way.[17] That meaning can also be seen in the use of the term "cherish" in common texts likely to have been in circulation

---

Declaration of Rights ("All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them").

[17]"To cherish" was defined as follows: "To support, to shelter, to nurse up," T. Sheridan, A General Dictionary of the English Language (1780) (Scolar Press, facsimile ed. 1967); "to support, nurse, shelter," W. Perry, The Royal Standard English Dictionary (4th Am. ed. 1796); "to support, help, to nurse up," J. Burn, A Pronouncing Dictionary of the English Language 52 (1786) (Scolar Press, facsimile ed. 1969); "to nurse, nourish, comfort, support," Noah Webster, A Compendious Dictionary of the English Language (1806) (Crown facsimile ed. 1970); "to support, to nurse up," T. Browne, The Union Dictionary (1806); "to support; to nurse up," G. Fulton & G. Knight, A General Pronouncing and Explanatory Dictionary of the English Language 59 (1814); "to support, to shelter, to nurse up," J. Walker, A Critical Pronouncing Dictionary and Expositer of the English Language 78 (1811); "To support and forward with encouragement, help, and protection; to shelter; to nurse up," S. Johnson, A Dictionary of the English Language (10th ed. 1810); "to make much of" and "to maintain or provide for," J. Buchanan, Linguae Britannicae Vera Pronunciat (1757) (Scolar Press facsimile ed. 1969); "to make much of, to maintain; to nourish," J. Kersey, Dictionarium Anglo-Britannicum (1708) (Scolar Press, facsimile ed. 1969).

A more modern view of the word is found in Roget's II Electronic Thesaurus which described a usage of "cherish" as "to have the highest regard for" and gives as synonyms the verbs "prize" and "treasure." The American Heritage Electronic Dictionary defines the verb "cherish" as meaning *"to hold dear."*

at that time.[18] Most importantly, that distinctive meaning can be seen from works of the framers themselves. John Adams, in Dissertation on the Canon and Feudal Law (1765), reprinted in 3 Works of John Adams 447 (C.F. Adams ed. 1851), described an "aspiring, noble principle founded in benevolence, and *cherished* by knowledge" (*id.* at 448); declared that "none of the means of information are more sacred, or have been *cherished* with more tenderness and care by the settlers of America, than the press" (*id.* at 457); and proclaimed that "[t]his spirit [of liberty], however, without knowledge, would be little better than a brutal rage. Let us tenderly and kindly *cherish*, therefore, the means of knowledge. Let us dare to read, think, speak, and write" (*id.* at 462) (emphasis supplied). In 1789, John Hancock, then Governor of the Commonwealth, spoke to the Massachusetts Legislature about "the commencement and operation" of the new Federal government, pronouncing that "[t]he early laws of the Union must *cherish* commerce"[19] (emphasis supplied).

---

[18]William Shakespeare wrote: "For what doth cherish Weeds, but gentle ayre," The Third Part of King Henry the Sixth, act 2, sc. 6 (1593). The Bible contains the verse: "As a nurse cherisheth her children," 1 *Thessalonians* 2:7 (King James). In 1769, William Robertson wrote: "He [Erasmus] first scattered the seeds, which Luther cherished and brought to maturity." 2 W. Robertson, Charles the Fifth 145 (Montezuma ed. 1904). This meaning apparently continued into the Nineteenth Century: In 1868, Edward Freeman wrote: "The young prince . . . was cherished during the following winter by a yeoman ignorant of his rank." 2 E.A. Freeman, Norman Conquest of England 75 (1868).

"Cherishment," in fact, meant "[n]ourishment" or "sustenance." Oxford English Dictionary 89 (2d ed. 1989) (stating that this definition is now obsolete). This meaning can be seen in the phrase, "they that spoyled my house, and left no kind of cherishment for me & my sonne." T. Nashe, Christs Teares Over Iervsalem 73 (1593). Similarly, "cherishing" meant "nourishing," as in the phrase, "Come, father-in-law of mine that is to be, what say you to a cherishing cup?" H. Fielding, Don Quixote in England, act 3, sc. 5 (1733).

[19]Governor's Message to the two branches of the Legislature (Jan. 8, 1789), in Resolves of the General Court 75 (1789). Massachusetts statesmen continued to use the term this way fifty years after the adoption of the Constitution. See, e.g., Address of Governor Davis, Jan. 21, 1834, reprinted in 1834 Resolves of the General Court 569, 574 ("It is the glory of our country, the most prominent feature of the policy of *cherishing* labor,

Thus, according to common usage in the late Eighteenth Century, a duty to cherish was an obligation to support or nurture. Hence, the "duty . . . to cherish the interests of literature and the sciences, and all seminaries of them; especially . . . public schools and grammar schools in the towns" is an obligation to support or nurture these interests and institutions. The breadth of the meaning of these terms ("duty . . . to cherish"), together with the articulated ends for which this duty to cherish is established, strongly support the plaintiffs' argument that the "duty . . . to cherish . . . the public schools" encompasses the duty to provide an education to the people of the Commonwealth. Part II, c. 5, § 2, states plainly that the duty to "cherish" — support — public schools arises out of the need to educate the people of the Commonwealth; it is reasonable therefore to understand the duty to "cherish" public schools as a duty to ensure that the public schools achieve their object and educate the people.

Constitutional structure, as well as constitutional language, supports the plaintiffs' argument that Part II, c. 5, § 2, imposes a duty on "legislatures and magistrates" to provide for the education of the populace. See *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 200 (1976). Part II, c. 5, § 2, is distinctively and prominently placed in the Constitution. The Constitution is composed of a short Preamble and two Parts.[20] Part One — "A Declaration of the Rights of the Inhabitants of the Commonwealth of Massachusetts" — contains thirty articles which declare the rights of the people. Part Two — "The Frame of Government" — contains six chapters which prescribe the structure and pow-

---

that it opens a mine of resources in which every individual may secure to himself the means of cultivating talent, as well as providing for other demands" [emphasis added]); Address of Governor Davis, Jan. 13, 1835, reprinted in 1834 Resolves of the General Court 27, 67 ("The Commonwealth will, I doubt not, take pleasure in *cherishing* and protecting, in all reasonable ways, these few descendants of a race whose fathers probably held dominion over this land before the Christian era" [emphasis added]).

[20]In the time since its adoption in 1780, the Articles of Amendment have been added, but the basic structure of the Constitution remains as it was in 1780.

ers of the government of the Commonwealth.[21] Part II, c. 5, § 2, is the second of two sections in the fifth chapter of the "Frame of Government"; the first section in c. 5 concerns the "university at Cambridge."[22] The framers' decision to dedicate an entire chapter — one of six — to the topic of education signals that it was to them a central concern. Their decision to treat education differently from other objects of government by devoting a separate chapter to education rather than listing it as a matter within the powers of the legislative or executive branches indicates structurally what is said explicitly by words: that education is a "duty" of government, and not merely an object within the power of government. Lastly, the framers' decision to place the provisions concerning education in "The Frame of Government" — rather than in the "Declaration of Rights" — demonstrates that the framers conceived of education as fundamentally related to the very existence of government.

This last point illustrates an instance where structure echoes language. The preservation of rights and liberties was one of the principal reasons for the formation of the Commonwealth and the adoption of a republican form of government. The Preamble to the Constitution states that the "end of the institution, maintenance and administration of government,

---

[21]The first three chapters of Part II, "The Frame of Government," prescribe, respectively, the legislative, executive, and judicial powers. The fourth chapter, which was annulled by the Constitution of the United States, provided for the election of delegates from the Commonwealth to the Congress of the United States. The fifth chapter, entitled "The University at Cambridge, And Encouragement of Literature," contains two sections; the first is entitled "The University," and contains three articles pertaining to Harvard University. The second section of c. 5, entitled "The Encouragement of Literature," is the provision at issue in the present case. The sixth chapter contains a collection of general provisions (several of which have been annulled by constitutional amendment) pertaining to oaths, officeholder qualifications, revision of the Constitution, habeas corpus, and other matters.

[22]At the time the Constitution was adopted, Harvard University had been in existence continuously for 144 years since its establishment by the General Court of the Massachusetts Bay Colony in 1636. See 1 Massachusetts Bay Records 183 (1853).

is to secure the existence of the body politic, to protect it, and to furnish the individuals who compose it, with the power of enjoying in safety and tranquility their natural rights and the blessings of life." Education, which Part II, c. 5, § 2, states is the means of diffusing wisdom, knowledge, and virtue, is, therefore, a prerequisite for the existence and survival of the Commonwealth.[23]

While both language and structure support the plaintiffs' argument that Part II, c. 5, § 2, imposes on "legislatures and magistrates" a duty to educate the populace, we consider also whether this duty is, in the defendants' words, "mandatory." The defendants argue that the duty to cherish in Part II, c. 5, § 2, cannot be mandatory because, first, the duty to cherish extends to objects other than the public schools, and second, because Part II, c. 5, § 2, establishes, in addition to the duty to cherish, the duty to "encourage" various societies and the duty to "countenance and inculcate" various habits and values.

_____

[23]The defendants argue that the placement of the education provision in "The Frame of Government," rather than in the "Declaration of Rights," undermines the plaintiffs' argument that they have a constitutional "right" to education in publicly supported elementary and high schools. For the reasons just discussed, this argument is unpersuasive; we believe that the placement of the education provisions in Part II, The Frame of Government, is a forceful statement that education is both a duty of and a prerequuisite for republican government. And, if "legislatures and magistrates" have a constitutional duty to educate, then members of the Commonwealth have a correlative constitutional right to be educated. See *Seattle Sch. Dist. No. 1 of King County* v. *State*, 90 Wash. 2d 476 (1978). See generally Hohfeld, Some Fundamental Legal Conceptions as Applied to Legal Reasoning, 23 Yale L.J. 16 (1913-1914). In addition, we note that a constitutional right to an education is fully consistent with the provisions of several articles in the Declaration of Rights: the right to liberty (art. 1), the right of self-government (art. 4), the right to elect officers and to be elected as an officer (art. 9), the right to "obtain right and justice freely" (art. 11), the right to be free from unreasonable searches (art. 14), the right and duty to "require of . . . lawgivers and magistrates an exact and constant observance of" the fundamental principles of the Constitution (art. 18), and the right to "assemble to consult upon the common good: give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer" (art. 19).

Several features of Part II, c. 5, § 2, strongly suggest that the duty to cherish schools is mandatory. First, "duty," according to common usage in the late Eighteenth Century, meant, as indicated above, "obligation." Second, the language of Pt. II, c. 5, § 2, contains in essence a double injunction: It not only sets forth the "duty"; it also, by the use of the term "shall," mandates the duty: "it *shall be* the *duty* of legislatures and magistrates*" (emphasis supplied). Third, the duty is enjoined "for all future periods of this Commonwealth." This unusual temporal reference underscores the continuing nature of the obligation and militates against a reading of "duty" as merely advisory. Fourth, the Constitution does not use the term "duty" lightly. None of the powers and responsibilities of the three branches of government is described or prescribed in the Constitution as a "duty."[24]

We are not deterred by the fact that the duty to "cherish" extends not only to "public schools and grammar schools in the towns" but also to "the university at Cambridge" and to "the interests of literature and the sciences, and all seminaries of them." We do not read the section to require that "legislatures and magistrates" cherish (i.e., support) each of

---

[24]For example, Part II, c. 1, § 1, which prescribes the powers and responsibilities of the Legislature does not use the term "duty"; it speaks instead of the grant of "full power and authority" to the Legislature to enact laws. See Part II, c. 1, § 1, art. 3 ("The general court shall forever have full power and authority to erect and constitute judicatories . . ."), and art. 4 ("And further, full power and authority are hereby given and granted to said general court, from time to time, to make, ordain, and establish" laws).

Similarly, Part II, c. 2, § 1, which prescribes the powers and responsibilities of the executive branch does not use the term "duty"; it states instead that the Governor "shall have authority" or "shall have full power and authority" to perform the tasks assigned. See Part II, c. 2, § 1, art. 4 ("The governor shall have authority from time to time" to assemble the councillors); art. 5 ("The governor, with advice of council, shall have full power and authority" to adjourn or convene legislative sessions). Although Part II, c. 2, § 1, does use the term "shall" (as in Part II, c. 2, § 1, art. 4, which provides that the Governor "shall, and may, from time to time, hold and keep a council, for the ordering and directing the affairs of the Commonwealth"); nowhere, does Part II, c. 2, § 1, employ the term "duty." Compare Part II, c. 3, of the Massachusetts Constitution.

these interests and institutions in the same manner. A sensible reading of the language is that each object of the duty to cherish is to be cherished in accordance with its nature. "Interests" are unlike institutions, and so are "cherished" in different ways from institutions. The "university at Cambridge" is different from "public schools and grammar schools in the towns" and so is cherished differently from them.[25]

We do, however, stop to consider the fact that, as the defendants point out, Pt. II, c. 5, § 2, imposes not only a duty to cherish certain educational interests and institutions, but also the duty "to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufacture, and a natural history of the country" and the duty "to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humour, and all social affections, and generous sentiments among the people." The defendants argue that these latter duties are so vague that they cannot be mandatory and enforceable, and that, if these latter duties are not mandatory, the first duty — the duty to cherish educational institutions, including public schools — cannot be mandatory. While the point has appeal, we believe the argument runs too far. It does not follow that if one duty (the duty to cherish the public schools) is mandatory, the other two duties must necessarily be mandatory. Whether the duties established in Part II, c. 5, § 2, are "mandatory" depends, among other things, on their content and their object. We have no occasion in this case to consider either the content or the object of the duties to "encourage" or to "countenance and inculcate." Simply put, the duties are different from one another and must be examined separately.

---

[25]Interestingly, however, at the time of the Constitution's adoption, the "university at Cambridge" received significant financial support from the General Court.

## C.

An examination of the language of Part II, c. 5, § 2, and the placement of that provision within the Constitution supports the plaintiff students' argument that Part II, c. 5, § 2, requires the State to provide them with an education. That conclusion is buttressed by an examination of the "conditions" under which Part II, c. 5, § 2, was "framed, the ends which it was designed to accomplish, the benefits which it was expected to confer, and the evils which it was hoped to remedy." *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 571 (1970), quoting *Tax Comm'r* v. *Putnam, supra.* To determine those conditions, we examine both the history of public education in the Commonwealth at the time the Constitution was adopted, and the specific circumstances of the adoption of Part II, c. 5, § 2. We begin with the former, and explore it in some detail because it forms the backdrop against which Part II, c. 5, § 2, was drafted by the framers and adopted by the people.

### 1.

Public education, both as a practice and as a value, was commonplace in Massachusetts in 1780. As the court has detailed in the past, the founders of the Massachusetts Bay Colony, and later of the Province of Massachusetts Bay "appreciated the importance and necessity of providing for the universal education of the people, at a very early period," and "laid the foundation of a system of common schools," *Jenkins* v. *Andover*, 103 Mass. 94, 96-97 (1869). See *Cushing* v. *Newburyport*, 10 Met. 508, 511 (1845).

A public commitment to education was evidenced from the first days of the colonial period. The Massachusetts Bay Colony was founded in 1630. Five years later, in 1635, the people of Boston agreed that "our brother Philemon Purmont shall be intreated to become scholemaster for the teaching

and nourtering of children with us."[26] The next year, in 1636, the General Court made a public grant of 400 English pounds to found a college. 1 Massachusetts Bay Records 183 (October 28, 1636). In 1642, the General Court enjoined the selectmen of every town to keep "a vigilant eye over their brethren and neighbours" to see "that none of them shall suffer so much Barbarism in any of their families, as not to endeavour to teach, by themselves or others, their Children and Apprentices," and prescribed a twenty-shilling fine for such neglect.[27]

In 1647, in a law which is credited with beginning the history of public education in America, the General Court required the towns to maintain a system of public schools. See Cubberley, Public Education in the United States 18 (1947). The statute of 1647 — which is the precursor to G. L. c. 71, § 1 — required every town with fifty or more householders to appoint a schoolmaster in the town "to teach all such Children as shall resort to him to Write and Read," and every town of one hundred or more householders or families to "set up a *Grammar School*, the Master thereof being able to Instruct Youth so far as they may be fitted for the University." For a town's failure to set up a grammar school in which students studied grammar, Latin, and Greek, the 1647

---

[26]Quoted in Tenth Annual Report of the Massachusetts Board of Education 7 (1849).

[27]The section, together with its preamble, provided in full:

"Forasmuch as the good Education of Children is of Singular behoofe and benefit to any Common-wealth, and whereas many Parents and Masters are too indulgent and negligent of their duty in that kind;

"It is Ordered, that the Select men of every Town, in the several Precincts and quarters where they dwell, shall have a vigilant eye over their brethren and neighbours, to see, First that none of them shall suffer so much Barbarism in any of their families, as not to endeavour to teach, by themselves or others, their Children and Apprentices, so much learning, as may enable them perfectly to read the English tongue, and knowldge of the Capital Lawes: upon penalty of *twenty shillings* for each neglect therin."

The General Laws and Liberties of the Massachusetts Colony (1672) at 26, reprinted in The Colonial Laws of Massachusetts (1890).

statute prescribed a penalty of five pounds a year, see Martin, The Evolution of the Massachusetts Public School System 58-60 (1915), to be paid over "to the next such School," every year until the offending town complied with the statute and set up a grammar school.[28] The 1647 statute did not ex-

---

[28]The 1647 statute also imposed religious and moral qualifications on teachers. We quote this remarkable statute in full:

"It being one chief project of Sathan to keep men from the knowledge of the Scripture, as in former times, keeping them in unknown Tongues, so in these latter times, by perswading from the use of Tongues, that so at least the true sense and meaning of the Original might be clouded and corrupted with false glosses of Deceivers; to the end that Learning may not be buried in the Graves of our fore Fathers, in Church and Common-wealth, the Lord, assisting our endeavours;

"It is therefore Ordered by this Court and Authority thereof; That every Town ship within this Jurisdiction, after the Lord hath increased them to the number of *fifty* Householders, shall then forthwith appoint one within their Towns, to teach all such Children as shall resort to him to Write and Read, whose Wages shall be paid either by the Parents or Masters of such Children, or by the inhabitants in general, by way of supply, as the major part of those that Order the prudentials of the Town shall appoint; Provided that those which send their Children not be oppressed by paying much more then they can have them taught for in other Towns.

"2. And it is further Ordered, That where any Town shall increase to the number of *one hundred* Families or Householders, they shall set up a *Grammar School*, the Master thereof being able to Instruct Youth so far as they may be fitted for the University: And if any Town neglect the performance hereof above one year, then every such Town shall pay *five pounds per Annum* to the next such School, till they shall perform this Order.

"3. Forasmuch as it greatly concerns the welfare of this Country, that the Youth thereof be Educated, not only in good Literature, but in sound Doctrine;

"This Court doth therefore commend it to the serious consideration, and special care of our Overseers of the Colledge, and the Select men in the several Towns, not to admit or suffer any such to be continued in the Office or Place of Teaching, Educating or Instructing Youth or Children, in the Colledge or Schools, that have manifested themselves unsound in the Faith, or scandalous in their Lives, and have not given satisfaction according to the Rules of Christ."

The General Laws and Liberties of the Massachusetts Colony (1672) 136, reprinted in The Colonial Laws of Massachusetts (1890).

pressly require towns to support these schools by general taxation, but this was the effect of the statute.[29]

In 1671, the General Court increased the penalty for a town's failure to set up a grammar school to ten pounds, again to be paid "unto the next Town School that is settled according to that law [of 1647]." The General Laws and Liberties of the Massachusetts Colony (1672 ed.) 137, reprinted in The Colonial Laws of Massachusetts (1890).[30]

After the grant of the new charter for the Province of Massachusetts Bay in 1692, one of the General Court's first acts was to issue school legislation like that which had been in effect in the colony. See An Act for the settlement and support of ministers and school-masters, Province Laws 1692-1693, c. 26, § 5, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay at 63. As before,

---

[29]In 1634, the General Court "made estates and abilities subject to rate for all public charges," Jackson, The Development of School Support in Colonial Massachusetts 76 (1969), and in 1638, the General Court made "every inhabitant in any towne" liable to contribute to the "common charges" of the towns. 1 Massachusetts Bay Records 240-241 (1853). These provisions, together with the 1647 law mandating the maintenance of schools, resulted in the townspeople taxing themselves to support the schools. See Jackson, *supra* at 75-83. See generally *Cushing* v. *Newburyport*, 10 Met. 508, 511 (1845).

[30]In 1683, the General Court revised the law to require towns of 500 or more families or householders to "set up, and maintain *two* Grammar Schools, and *two* Writing Schools" (emphasis added), and to prescribe a penalty of twenty pounds a year for towns of 200 or more householders that failed to set up schools. Several Laws Made at the Second Sessions of the General Court 99 (1683), reprinted in The Colonial Laws of Massachusetts at 305 (1890).

In 1849, Horace Mann, the first Secretary of the Board of Education, calculated the value of the penalties imposed by these early laws on towns that failed to maintain schools. See The Massachusetts System of Common Schools, Tenth Annual Report of the Massachusetts Board of Education 10-11 (1849) (Tenth Annual Report). According to his calculations, five pounds — the penalty imposed by the 1647 law — was equivalent, at that time, "to the work of a common laborer, (with board, but without clothing,) for twenty-four hundred days; or all the working days in almost eight years," and a fine of sixty pounds — imposed by amendments to the statute of 1647 on larger towns — would have amounted, in "country pay," to 423 bushels of Indian corn. Tenth Annual Report, *supra* at 11 n.*.

towns which neglected their obligation would be assessed a
penalty — ten pounds a year — "which penalty shall be to-
ward the support of such school or schools within the same
county, where there may be most need." *Id.* As for the sup-
port of these public schools, in a separate law also enacted in
1692, the General Court granted town selectmen the author-
ity "to assess the inhabitants and others resident within such
town . . . for the maintenance and support of the . . .
schools." "An Act for the regulating of townships, choice of
town officers, and setting forth their power," Province Laws
1692-1693, c. 28, § 6, reprinted in 1 Acts and Resolves of
the Province of the Massachusetts Bay 66.

In 1701, the General Court found that observance of this
"wholesome and necessary law [the 1692 school law] is
shamefully neglected by divers towns, and the penalty there-
fore not required" and that this neglect "tend[ed] greatly to
the nourishing of ignorance and irreligion." An Act in addi-
tion to An act for the settlement and support of schools and
school-masters, Province Laws 1701-1702, c. 10, preamble,
reprinted in 1 Acts and Resolves of the Province of the Mas-
sachusetts Bay at 470. To counter this tide of neglect, the
General Court amended the school law to increase the pen-
alty for violation from ten to twenty pounds per year, "any
law, usage or custom to the contrary notwithstanding"; to re-
quire approval of all grammar school masters by the minister
of the town and the ministers of two adjacent towns; and to
prohibit any minister of a town from also being the school-
master of the town. In addition, the 1701 statute directed the
"justices of peace" of the counties to "take effectual care
that the laws respecting schools and school-masters be duely
observed and put in execution," and "all grand jurors" to
"diligently inquire" into breaches of the school law. *Id.* at
c. 10, §§ 1-4. Ten years later, in 1711, the General Court
enacted a statute prohibiting all but those who are "of sober
and good conversation, and have the allowance and approba-
tion of the selectmen" from being schoolmasters in either
writing schools or grammar schools, and providing a penalty
for violation of this provision. An Act against intemperance,

immorality and profaneness, and for reformation of manners, Province Laws 1711-1712, c. 6, §§ 17, 18, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay 681-682.

After finding "by sad experience" that "many towns" required under the school law to set up a grammar school and "very able" to do so chose instead to ignore the law and incur the fine, the General Court again increased the penalty for violating the school law, to thirty pounds for towns of 150 families, forty pounds for towns of 200 families, "and so *pro rato* in case the town consist of two hundred and fifty or three hundred families." An Act in addition to the several acts for settlement and support of school-masters, Province Laws 1718-1719, c. 2, reprinted in 2 Acts and Resolves of the Province of the Massachusetts Bay at 100.

Fifty years later, in 1768, the General Court enacted a statute authorizing the inhabitants of precincts within towns and districts to raise money to support the schools within their individual precincts. This statute authorized precincts that wished to "expend more for the instruction of children and youth, in useful learning, within their own bounds, than, as parts of such towns or districts, they are, by law, held to do" to tax themselves additional amounts, in an annual vote, for such purposes. An Act in further addition to the several acts for the settlement and support of schools and schoolmasters, Province Laws 1767-1768, c. 16, reprinted in 4 Acts and Resolves of the Province of the Massachusetts Bay at 988.

In addition to establishing a system of public schools, the General Court also established and supported a college. In 1636, the General Court of the Bay Colony founded Harvard College with a public grant of 400 pounds, and in 1650, it granted a charter to the college.[31] In 1640, the General

---

[31]"The Court agreed to give 400 [pounds] towards a schoale or colledge, whearof 200 [pounds] to bee paid the next yeare, and 200 [pounds] when the worke is finished, & the next Court to appoint wheare and what building." Massachusetts Bay Records, *supra* at 183. See S.E. Morison, The Founding of Harvard College 169-170 (1935) (The sum of 400 pounds

Court granted the revenues of the Charlestown-Boston ferry to Harvard College. 1 Massachusetts Bay Records 304 (1853), and, in 1694, two years after the creation of the Province of Massachusetts Bay, the General Court of the Province confirmed the grant of the Charlestown ferry revenue to the college. Province Laws 1694-1695, c. 38, reprinted in 7 Acts and Resolves of the Province of the Massachusetts Bay 452 (1892). Throughout the period of the colonial and provincial governments, the General Court made grants for the support of the president and professors of the college. See 2 J. Quincy, History of Harvard University 238-257 (1860).[32]

---

"was a formidable one for so small a community as Massachusetts Bay: more than half the entire colony tax levy for 1635, and almost one-quarter the tax levy for 1636. And although payment was made by instalments stretching over several years, it is clear that subsequent General Courts regarded the promise of October 28, 1636, as the 'country's gift,' and a sacred obligation"). Harvard University is governed today under the charter of 1650. See Bailyn, Foundations, Glimpses of the Harvard Past 10 (1986).

[32]In the early years of the college, individual towns in Massachusetts (and in the other colonies) voted to support the college by agreeing that each family in the town would contribute one peck of corn to the college. See S.E. Morison, The Founding of Harvard College, *supra* at 314-319. In 1644, the General Court of Massachusetts Bay "ordered, that the deputies shall commend it to the several towns, . . . of every family allowing one peck of corne, or 12d in mony or other commodity, to be sent in to the Treasurer, for the colledge at Cambridge." 2 Massachusetts Bay Records 86 (1853).

Following the adoption of the Constitution, the General Court continued for a time (but not without some coaxing) to pay the salaries of the president and professors of Harvard College. See, e.g., St. 1783, c. 96 ("Grants to the President and Fellows of Harvard College"). 2 J. Quincy, History of Harvard University 243-253 (1860). Revenue from the Charlestown ferry (or certain in lieu payments) continued to support the college until 1828. Morison, The Founding of Harvard College 302 (1935). See, e.g., St. 1795, c. 70 ("An Act to alter the appropriation of the sum of *two hundred pounds*, payable annually by the proprieters of the West-Boston Bridge, to the University of Harvard College"), and 3 Perpetual Laws of the Commonwealth 64 (1801) (February 6, 1800) ("An Act to alter the appropriation of the sum of *two hundred pounds* per annum, made by an Act passed in [1796] . . . [to the University of Harvard College]"). See generally Bailyn, Foundations, Glimpses of the Harvard Past, *supra* at 11-12 ("No English college had been created by a legislature, and none was

Educational concerns are evidenced in the poor laws of the provincial government. The overseers of the poor in the towns (or the selectmen of the towns where there were no overseers) were authorized by the General Court to "bind out" for work "all such children whose parents shall . . . be thought . . . unable to maintain them," with the proviso, however, that provision was "to be made for the instruction of children so bound out, to read and write, as they may be capable."[33] Indeed, the General Court's concern for. education ran so high during this period that it granted the overseers of the poor in Boston the authority to "bind out into good families" all children whose parents —whether poor or not — failed to teach them to read.[34]

The General Court's vigilance over public education during the colonial period showed itself in some unusual places.

---

sustained by the community as Harvard was. . . . Harvard, like all Massachusetts institutions of higher education, was supported by the state well into the nineteenth century. . . . [It] was originally created as a public institution, and was governed as such for almost two hundred years").

[33]An Act of supplement to the acts referring to the poor, Province Laws 1703-1704, c. 14, § 1, reprinted in 1 Acts and Resolves of the Massachusetts Bay Province at 538. An act enacted six years later altered the proviso such that provision was to be made "for the instructing of children so bound out; to wit, males, to read and write; females to read, as they respectively may be capable." An Act for explanation of and supplement to the act referring to the poor, Province Laws 1710-1711, c. 6, § 1, reprinted in 1 Acts and Resolves of the Massachusetts Bay Province 654.

[34]"And forasmuch as there is great negligence in sundry persons as to the instructing and educating their children, to the great scandal of the Christian name, and of dangerous consequence to the rising generation,— Be it further enacted,

"That where persons bring up their children in such gross ignorance that they do not know, or are not able to distinguish, the alphabet or twenty-four letters, at the age of six years, in such case the overseers of the poor are hereby impowered and directed to put or bind out into good families, such children, for a decent and Christian education, as when parents are indigent and rated nothing to the publick taxes, unless the children are judged uncapable, through some inevitable infirmity."

An Act for employing and providing for the poor of the town of Boston, Province Laws 1735-1736, c. 4, § 5, reprinted in 2 Acts and Resolves of the Massachusetts Bay Province at 757-758.

In statutes prohibiting the sale of liquor without a license, the General Court provided that persons who violated the prohibition were to pay a fine, one-half of which was to be paid to the informer and the other half "to and for the use and support of a free grammar- or writing school or schools in the town where the offence shall be committed, then to the use of any such school in the town next adjacent."[35] These were not the only fines directed toward the support of "free grammar- or writing school[s]" in the towns. Persons who failed to give a "true list of their estate and polls" to the taxing officials of their town were fined forty shillings, one-half to be paid to the informer, and one half "for and towards the support of the schoolmaster in said town; and for want of such schoolmaster, according to law in said town, then to the use of the next grammer-school master in the county."[36]


2.


By 1780, a system of public schools had been in existence for over 130 years in Massachusetts, a college had been in existence for over 140 years, and the values of public education had been expressed and supported in a wide variety of ways. It was against this background and with this experience that the delegates to the Constitutional Convention of 1779-1780 framed, and the people of Massachusetts adopted,

---

[35]An Act for granting unto his majesty an excise upon wines, liquors and strong drink sold by retail, Province Laws 1700-1701, c. 8, § 6, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay at 435 (four-pound fine); An Act granting unto his majesty an excise upon wines, liquors and strong drink sold by retail, Province Laws 1701-1702, c. 15, § 6, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay at 477 (same); An Act granting unto her majesty an excise upon wines, liquors and strong drinke sold by retail," Province Laws 1703-1704, c. 5, § 5, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay at 529 (same).

[36]An Act for better inquiry into the ratable estate of the respective towns, Province Laws 1702-1703, c. 4, § 5, reprinted in 1 Acts and Resolves of the Province of the Massachusetts Bay at 516.

the Constitution of the Commonwealth, including Part II, c. 5, § 2.[37]

We now examine the history of the adoption of Part II, c. 5, § 2, of the Constitution. Part II, c. 5, § 2, was drafted by a drafting committee charged by the delegates to the 1779-1780 Constitutional Convention with the task of preparing the initial draft of a Constitution.[38] John Adams is generally regarded as the principal author of the draft Constitution produced by this committee,[39] including the section

---

[37]The Constitution was submitted for approval to "Male Inhabitants of the Age of twenty one years and upwards, voting in the several Towns and Plantation meetings," Resolve of March 2, 1780, quoted in full in Morison, The Struggle over the Adoption of the Constitution of Massachusetts, 1780, Massachusetts Historical Society 353, 359 (May 1917).

[38]See Report of a Constitution or Form of Government for the Commonwealth of Massachusetts Agreed upon by the Committee — to be laid before the Convention of Delegates, reprinted in the Journal of the Convention 191-215, and in 8 Papers of John Adams 236, 260 (1989).

[39]The delegates to the constitutional convention of 1779-1780 elected a committee of thirty (originally thirty-one) from their ranks to prepare a draft of a Constitution. Journal of the Convention for Framing a Constitution of Government for the State of Massachusetts Bay from the Commencement of their First Session, September 1, 1779, to the Close of their Last Session, June 16, 1780 24 (1832) (hereinafter, Journal of the Convention). 8 Papers of John Adams editors' note at 230 (1989). That committee of thirty in turn selected a subcommittee of three men — James Bowdoin, president of the Convention, Samuel Adams, and John Adams — to do the actual drafting. The subcommittee then assigned the task to John Adams. See Morison, A History of the Constitution of Massachusetts 18-20 (1917). John Adams wrote the draft of the Constitution between September 13 and the middle of October, 1779. 8 Papers of John Adams, editors' note at 235 (1989).

No record has been found of the draft that John Adams presented to the subcommittee of three. Nor is there a record of any deliberations of the subcommittee, a draft presented by the subcommittee to the committee of thirty, or any deliberations of the committee of thirty. See 8 Papers of John Adams, *supra*; 4 Works of John Adams editor's note at 215-216 (C.F. Adams ed. 1851). It is generally believed, however, that the draft of a Constitution which the committee of thirty presented to the convention delegates (Report of a Constitution or Form of Government for the Commonwealth of Massachusetts, reprinted in the Journal of the Convention 191-215) is substantially the work of John Adams. See 8 Papers of John Adams, *supra*; 4 Works of John Adams, *supra*.

which became Part II, c. 5, § 2.[40] At the convention, the delegates accepted Part II, c. 5, § 2, as drafted, and included it without change in the proposed Constitution.[41] The delegates then sent the proposed Constitution to the towns for review by the people. When the town returns were in, the delegates determined that the people had approved the proposed Constitution as written, and declared the Constitution ratified, including Part II, c. 5, § 2, as originally drafted.[42]

The returns of the towns are vivid evidence that the people who adopted the Constitution of 1780 understood Part II, c. 5, § 2, as imposing a duty on Legislatures and magistrates to provide for the education of the people. When the proposed Constitution was sent to the towns, the towns were

---

[40]Part II, c. 5, § 2, of the Constitution is reputed to have been John Adams's "favorite section." Morison, A History of the Constitution of Massachusetts 27 (1917). See 8 Papers of John Adams, *supra* at editors' n.138 at 270.

[41]See Journal of the Convention 58 (Part II, c. 5, § 2, "was then read, and accepted, without amendment"). This is the sole mention of the provision in the Journal of the Convention. Although the delegates made no change to the text of the provision, they renumbered it, from c. 6 to c. 5. The renumbering apparently resulted from a decision that c. 1 of the draft Constitution, the "Declaration of Rights," should become Part I of the Constitution, and that the remaining chapters should be grouped together as Part II of the Constitution. Compare Report of a Constitution or Form of Government for the Commonwealth of Massachusetts Agreed upon by the Committee — to be laid before the Convention of Delegates, reprinted in Journal of the Convention 191-215, and in 8 Papers of John Adams 236, 260 (as c. 6, § 2), with A Constitution or Frame of Government, Agreed upon by the Delegates of the People of the State of Massachusetts-Bay, — In Convention, reprinted in Journal of the Convention 222, 245 (as Part II, c. 5, § 2).

[42]At some point between the time the proposed Constitution was sent to the towns for review and the time it was declared ratified, one change to the wording of Part II, c. 5, § 2, was made. In the draft Constitution submitted by the committee to the convention and in the proposed Constitution sent by the convention to the towns, the provision had read: "it shall be the duty of *legislators* and magistrates . . . to cherish" (emphasis added), but in the Constitution which was declared ratified on June 15, 1780, and effective on October 25, 1780, the provision read: "it shall be the duty of *legislatures* and magistrates . . . to cherish" (emphasis added). Compare Journal of the Convention 191, 214, with Journal of the Convention 222, 245. We have found no written explanation for this change.

requested to discuss and vote on the Constitution, section by section, and, if they had objections to any section, to "state their Objections distinctly and the Reasons therefor."[43] While the towns as a whole overwhelmingly accepted Part II, c. 5, § 2, without comment,[44] five towns recorded objections to the provision. These objections share a common understanding of the provision; each of the objections is premised on the idea that, if the provision were to be included in the Constitution, the Legislature would issue legislation mandating public education in all the towns. It is precisely this to which the towns objected, although for a variety of reasons.

The townspeople of Colrain wrote: "[W]e Object to the Town being oblidged to keep Gramer Schools Reason as Towns in General are not of Ability to Keep a Sufficency of English Schools."[45] The town of West Springfield wrote: "Voted to erase the Word *Grammer-Schools*. The Reason why we think that Injunction unsalutary is because many Towns in the Country are not under Circumstances to receive any considerable advantage from Grammar Schools and therefore think it a Grievance to be at so great Expence when a good English School may answer all the valuable Ends most of the Inhabitants can expect to receive from Schools."[46] The town of Sutton proposed "that the word

---

[43]Convention Resolve of March 2, 1780, contained in Constitution or Frame of Government (1780) 52, reprinted in Morison, The Struggle over the Adoption of the Constitution of Massachusetts, Massachusetts Historical Society 353, 359 (May, 1917).

[44]See Returns of the Towns on the Constitution of 1780, reprinted from the Massachusetts Archives and other sources in O. Handlin & M. Handlin eds., The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780 at 475-930 (1966) (hereinafter, Documents).

[45]The complete entry is as follows: "Also Chapter 5 Section 2 we Object to the Town being oblidged to keep Gramer Schools Reason as Towns in General are not of Ability to Keep a Sufficency of English Schools for the Amendment 26 against 3." Return of Colrain, reprinted in Documents, *supra* at 551.

[46]The complete entry is: "Chapter 5 Section II. Voted to erase the Word *Grammer-Schools*. The Reason why we think that Injunction unsalutary is because many Towns in the Country are not under Circumstances to re-

Grammer be deled. Because we are and have long been of the opinion that the obloiging every Town to keep a Grammer School is rather a stagnation to the learning of Youth than any promotion of it."[47] The town of Bellingham opined that "the Encouragement of literature is Good and we think the inhabitants of Each Town have the Sole Right and are the Properest Judges of what Schooles are the most Suteall for the inhabitants thereof as they suport and have the advantage thereof and no town has any busness with another Town about Schooles. as that is not a matter of legeslation."[48] Lastly, the town of Middleborough objected to the provision more generally, writing that "it is Such a Complicated inconsistant Flourish of Expressions that it is in our opinion impossible To Seperate the good which we Conceive to Be intended by it, from the Numerous Evils which may take place in Consequence of it"; the people of Middleborough concluded, however: "But would by all means Encourage all Nessasary Scools in the Several Towns."[49]

---

ceive any considerable advantage from Grammar Schools and therefore think it a Grievance to be at so great Expence when a good English School may answer all the valuable Ends most of the Inhabitants can expect to receive from Schools." Return of West Springfield, reprinted in Documents, *supra* at 620-621.

[47]The complete entry is: "In Page 43: 3d. Line from the Bottom propose that the word Grammer be deled. Because we are and have long been of the opinion that the obloiging every Town to keep a Grammer School is rather a stagnation to the learning of Youth than any promotion of it." Return of Sutton, reprinted in Documents, *supra* at 882.

[48]The complete entry is: "As to Section 2d. the Encouragement of literature is Good and we think the inhabitants of Each Town have the Sole Right and are the Properest Judges of what Schooles are the most Suteall for the inhabitants thereof as they suport and have the advantage thereof and no town has any busness with another Town about Schooles. as that is not a matter of legeslation." Return of Bellingham, reprinted in Documents, *supra* at 747.

[49]The complete entry is: "Chapter 5th Section 2nd Literature it is Such a Complicated inconsistant Flourish of Expressions that it is in our opinion impossible To Seperate the good which we Conceive to Be intended by it, from the Numerous Evils which may take place in Consequence of it: But would by all means Encourage all Nessasary Scools in the Several Towns." Return of Middleborough, reprinted in Documents, *supra* at 699.

These objections reflect the townspeople's knowledge of and experience with the colonial laws mandating public education in the towns and their belief that this provision of the Constitution would require the new Legislature to continue to mandate public education in the towns. Given the uniformity of this understanding in the recorded objections, we think it a safe assumption that many, if not all, of the other towns — which voted for the provision — probably had a similar understanding of the effect of the provision. We believe that the people of those other towns, who voted for the provision without objection, and whose affirmative vote carried the day, endorsed the provision with the understanding that it would require the Legislature to mandate universal public education.

It seems plain that this is what the framers of the Constitution of 1780 intended. There is substantial evidence that John Adams believed that widespread public education was integral to the very existence of a republican government. In an early and influential essay, Adams described the strong alliances between ignorance and oppression, and between knowledge and liberty.[50] He praised the early English settlers of the colony as deeply learned and deeply committed to liberty. They knew, he said, that nothing countered political oppression more than "knowledge diffused generally through the whole body of the people" and so they set out to "propagate and perpetuate knowledge."[51] Under their efforts, "the education of all ranks of people was made the care and expense of the public" and the result was that a "native of America who cannot read and write is as rare an appearance as . . . a comet or an earthquake."[52] There were, he claimed,

---

[50]Dissertation on the Canon and Feudal Law, in 3 Works of John Adams 447, 448 (C.F. Adams ed. 1851) ("[w]herever a general knowledge and sensibility have prevailed among the people, arbitrary government and every kind of oppression have lessened and disappeared in proportion").

[51]*Id.* at 455.

[52]*Id.* at 456. John Adams was himself a product of the Braintree public schools, and, on his graduation from Harvard in 1755, a teacher in the Worcester public schools, until he was called to the Bar. 1 Diary and Autobiography of John Adams at I (1961). Long afterward, in 1786, he told

however, some persons in Massachusetts "who affect to censure this provision for the education of our youth as a needless expense, and an imposition upon the rich in favor of the poor"; this attitude, Adams continued, was calculated to foster ignorance and, with it, servility. Ignorance and servility were not the lot of the people of Massachusetts, however, because people have natural rights to liberty and to knowledge (they have "a right, from the frame of their nature, to knowledge"). In Massachusetts, the right to liberty was not only a natural right but also the inheritance bequeathed by "our fathers [who] have earned and bought it for us, at the expense of their ease, their estates, their pleasure, and their blood." Dissertation on the Canon and Feudal Law, in 3 Works of John Adams 456 (C.F. Adams ed. 1851). To Adams, these rights were interdependent; the former could not be maintained without the latter: "[L]iberty cannot be preserved without a general knowledge among the people." *Id.* For this reason, he argued, "the preservation of the means of knowledge among the lowest ranks, is of more importance to the public than all the property of all the rich men in the country." *Id.* at 457.

In 1776, three years before drafting the Constitution of the Commonwealth, Adams wrote and published a pamphlet entitled Thoughts on Government, in which he endeavored to answer the question "what plan I would advise a colony to pursue, in order to get out of the old government and into a new one."[53] He offered that "there is no good government but what is republican." Thoughts on Government, in 4 Works of John Adams 194 (C.F. Adams ed. 1851). He described the requirements of a Constitution for a republican government. He prescribed a tripartite system of government in which the executive, legislative, and judicial branches are independent of one another, a "militia law," and provisions

---

a companion that "[t]he Meeting house, Schoolhouse and Training Field are the Scaenes where New England men were formed." 3 Diary and Autobiography, *supra* at 195.

[53]Thoughts on Government in 4 Works of John Adams, *supra* at 191.

for widely dispersed public education: "Laws for the liberal education of youth, especially of the lower class of people, are so extremely wise and useful, that, to a humane and generous mind, no expense for this purpose would be thought extravagant." *Id.* at 199. In a subsequent version of this plan, he wrote that "two things are indispensably to be adhered to, — one is, some regulation for securing forever an equitable choice of representatives; another is, the education of youth, both in literature and morals."[54]

Samuel Adams, the second member of the drafting subcommittee of three, also took pride in and instruction from the commitment of the early settlers to public education. In 1775, he wrote to James Warren: "Our Ancestors in the most early Times laid an excellent Foundation for the security of Liberty by setting up in a few years after their Arrival a publick Seminary of Learning; and by their Laws they obligd every Town consisting of a certain Number of Families to keep and maintain a Grammar School."[55] He wrote also of his regret that the "extraordinary Expence" of waging the Revolution was taking resources away from the public schools, and asked whether, if this "Inattention" were to continue, "would not the leading Gentlemen do eminent Service

---

[54]Letter to John Penn of North Carolina (Jan., 1776), 4 Papers of John Adams 209 (R. Taylor ed. 1979). In a Defence of the Constitutions of Government (1787), Adams again extolled the importance of public education: "The instruction of the people, in every kind of knowledge that can be of use to them in the practice of their moral duties, as men, citizens, and Christians, and of their political and civil duties, as members of society and freemen, ought to be the care of the public, and of all who have any share in the conduct of its affairs, in a manner that never yet has been practiced in any age or nation. The education here intended is not merely that of the children of the rich and noble, but of every rank and class of people, down to the lowest and poorest. It is not too much to say, that schools for the education of all should be placed at convenient distances, and maintained at the public expense. The revenues of the state would be applied infinitely better, more charitably, wisely, usefully, and therefore politically, in this way, than even in maintaining the poor. This would be the best way of preventing the existence of the poor." 4 Works of John Adams, *supra* at 168.

[55]Letter to James Warren, in 3 Writings of Samuel Adams 232, 235 (H.A. Cushing ed. 1968).

to the Publick, by impressing upon the Minds of the People, the Necessity & Importance of encouraging that System of Education, which in my opinion is so well calculated to diffuse among the Individuals of the Community the Principles of Morality, so essentially necessary to the Preservation of publick Liberty."[56]

This examination of the views of those who framed and those who adopted our Constitution provides compelling support for the argument that Part II, c. 5, § 2, was intended to impose on Legislatures and magistrates the duty to provide for the education of the people. The townspeople who left records of their debates on the proposed Constitution plainly stated their view that Part II, c. 5, § 2, would require the Legislature to mandate the maintenance of schools in the towns. The framers created a Constitution which by its words and its structure states plainly that providing for the education of the people is both duty of and prerequisite for a republican government, and in their writings, the Adams cousins stated this belief repeatedly and fervently. We turn now to the statements and actions of legislators and magistrates on the adoption of the Constitution in 1780, and find that they, too, understood Part II, c. 5, § 2, as imposing on Legislatures and magistrates the duty to educate the populace.

---

[56]*Id.* at 236. James Bowdoin, the third member of the drafting subcommittee (and the president of the constitutional convention) demonstrated a commitment to the value of education through his deeds. In addition to being the second person elected to the office of Governor of the Commonwealth, he was a founder and the first president of the American Academy of Arts and Sciences and a member of the Harvard University Corporation. See G. Kershaw, James Bowdoin II: Patriot and Man of the Enlightment (1976); 2 J. Quincy, History of Harvard University 225 (1860). Bowdoin College, established by the General Court in 1794, was named for him. St. 1794, c. 16. See Governor Bowdoin and His Family 3-6 (1969).

## D.

### 1.

Part II, c. 5, § 2, of the Constitution commanded the attention of legislators and magistrates immediately after the Constitution was adopted. At the opening of the first legislative session held under the newly adopted Constitution, the Legislature issued a statement pledging itself to its new responsibilities. Answer of a Committee of both Houses of Assembly of Massachusetts to the Speech of His Excellency the Governor at the Opening of the Session (Nov. 7, 1780), in Massachusetts, Colony to Commonwealth: Documents on the Formation of Its Commonwealth 163 (R. Taylor ed. 1961). A substantial portion of its address was devoted to Part II, c. 5, § 2. Echoing the language of the constitutional provision, the Legislature stated: "Inasmuch as knowledge and virtue are essential to the preservation of freedom in a State, we shall be happy in affording the highest marks of attention and respect to all Seminaries of Literature, and yielding them all the support they may need, and which it becomes the Representatives of a wise and free people to afford . . . ." *Id.* at 164-165. On the specific topic of schools, the Legislature pledged itself to address the needs of the public schools: "Nor can the schools throughout this Commonwealth be permitted to continue under such inattention and discouragement as they have for many years suffered, to the irreparable injury of the present and future generation, and to the indelible disgrace of a free government. We shall therefore hold ourselves obliged to form proper establishments for restoring them to their primitive dignity and usefulness." *Id.* at 165.

In 1789, nine years after the adoption of the Constitution, the Legislature powerfully stated its view that Part II, c. 5, § 2, imposed on it the "duty" to "provide for the education of youth." In that year, the Legislature enacted the Commonwealth's first comprehensive school law,[57] and in doing so, expressly declared itself to be following its constitutional

---

[57]An Act to provide for the instruction of youth, and for the promotion of good education, St. 1789, c. 19.

duty. The preamble to the 1789 statute declares: "Whereas the Constitution of this Commonwealth hath declared it to be the duty of the General Court to provide for the education of youth; and whereas a general dissemination of knowledge and virtue is necessary to the prosperity of every State, and the very existence of a Commonwealth: Be it enacted . . . ." St. 1789, c. 19, preamble.[58]

Throughout the early years of the Commonwealth, legislators and magistrates — several of whom had been delegates to the constitutional convention — publicly articulated their views of the responsibilities imposed on them by Part II, c. 5, § 2. In speeches and other public messages, they stressed several points repeatedly: They described Part II, c. 5, § 2, of the Constitution as imposing on them a duty or injunction. They stated emphatically that public education was integral to the republican form of government newly adopted in the Commonwealth. They characterized and extolled public education as education for the rich and the poor alike. Lastly,

---

[58]In addressing the Legislature two and one-half weeks before the passage of the 1789 school law, Governor John Hancock stated:

"That this Commonwealth . . . may increase its own internal prosperity . . . we ought to support and encourage the means of Learning, and all Institutions for the Education of the rising generation; an equal distribution of Intelligence being as necessary to a free Government, as Laws for an equal distribution of property.

"Our wise and magnanimous Ancestors impressed with this Idea, were very liberal and careful in the establishment of Institutions for this purpose, among which, that of our University in Cambridge, and that of the Grammar Schools in our Towns were very important: every necessary attention will certainly be paid to the former, and I cannot but earnestly recommend to your inquiry, the reason why the latter is so much neglected in the State: should any new laws be wanted in this matter, you cannot do your Country a more essential service than providing them."

Speech of Governor John Hancock, June 8, 1789, reprinted in 1788-1789 Acts and Resolves 745, 746. The following January, six months after the enactment of the statute, Governor Hancock proclaimed to the Legislature: "Our happiness so essentially depends upon the encouragement of Literature, & the dissemination of useful knowledge, that the fathers of the people will always have them in their view." Speech of Governor John Hancock, Jan. 19, 1790, reprinted in 1788-1789 Acts and Resolves 749, 752.

they stated, in numerous different ways, that ensuring the education of the population was a matter of State-wide responsibility.

Thus, in 1791, Governor John Hancock pleaded with the Legislature to use State resources to help citizens in the frontier parts of the State to set up schools. In that address he stated: "I feel myself so much impressed with the disagreeable situation of our fellow Citizens in the eastern part of the Commonwealth [referring to that part of Massachusetts now located in the State of Maine] . . . that I cannot but urge it upon you Gentlemen, to take measures for their relief, so far as it is within your power to do it." Speech of Governor John Hancock, Jan. 28, 1791, reprinted in 1790-1791 Resolves of the General Court 563, 564. Hancock urged the Legislature to take action, and advised the legislators that "the resources of the State, by the appropriation of wild lands, or by any other means, are such, as will allow you to assist that society in their laudable endeavours to disseminate the principles of Religion and morality amongst our fellow Citizens." Id.

In 1793, Governor Hancock requested the Legislature to turn its attention to the entire system of public schools in the Commonwealth: "Amongst the means by which our government has been raised to its present height of prosperity, that of education has been the most efficient; you will therefore encourage and support our Colleges and Academies[59]; but more watchfully the Grammar and other town schools. These offer equal advantages to poor and rich; should the support of such institutions be neglected, the kind of education which a free government requires to maintain its force, would soon be forgotten."[60]

In 1794, Samuel Adams, assuming the office of Governor on the death of Governor Hancock, addressed the General Court on the "great and important" subject of "the educa-

[59]See generally G.H. Martin, The Evolution of the Massachusetts Public School System 118-134 (1915) (discussing private academies).

[60]Quoted in Cubberley, Public Education in the United States 90 (1947).

tion of our children and youth." Samuel Adams declared that the security of the State depended on the education of youth; one reason, among others, was that education "qualif[ies] them [youth] to discover any error, if there should be such, in the forms and administration of Governments, and point out the method of correcting them." Address to the Massachusetts Legislature, Jan. 17, 1794, reprinted in 4 The Writings of Samuel Adams 359-360 (H.A. Cushing ed. 1968). "But," Governor Adams continued, "I need not press this subject, being persuaded, that this Legislature from the inclination of their minds, as well as in regard to the duty enjoined by the Constitution, will cherish 'the interest of Literature, the Sciences, and all their Seminaries.'" *Id.* at 360. The next year, Governor Adams, like Governor Hancock just two years before, warned the legislative body of the dangers to the public schools of the growing phenomenon of private "Academies." While praising the "patriotic exertions of worthy citizens" to establish the private academies, he continued: "[P]erhaps it may be justly apprehended, that multiplying them, may have a tendency to injure the ancient and beneficial mode of Education in Town Grammar Schools. The peculiar advantage of such schools is, that the poor and the rich may derive equal benefit from them; but none excepting the more wealthy, generally speaking, can avail themselves of the benefits of the Academies. Should these institutions detach the attention and influence of the wealthy, from the generous support of town Schools, is it not to be feared that useful learning, instruction and social feelings in the early parts of life, may cease to be so equally and universally disseminated, as it has heretofore been." Address to the Legislature of Massachusetts, June 3, 1795, in 4 Writings of Samuel Adams, *supra* at 375, 378-379.

Governor Caleb Strong, in 1801, devoted an entire address to the Legislature on "the education of youth," stating that "[a]mong the various subjects of State Legislation, there is none more important to the preservation of our Free Govern-

ments."[61] Like many before him, Governor Strong praised the early settlers who, he said, "considered the education of children, as the most essential duty, and the most important exercise of government" and "provided for the establishment of schools for the children of the poor as well as the rich."[62] In concluding, Governor Strong asked the legislators: "If any of the towns or plantations which have lately settled in the Commonwealth, are unable to provide the means of instruction and education at their own expense, will it not be expedient for the public to afford them assistance, that no children may grow up in the State without instruction."[63] In response to Governor Strong, the Senate proclaimed that a republic cannot "long exist, without the general diffusion of knowledge among every class of citizen"; agreed that "no subject of legislation can be more important"; and declared that "an early and unwearied attention to the instruction of our youth" was its "duty, which to neglect would be a breach of the trust reposed in us by our constituents." Answer of the Senate, June 4, 1801, in Resolves of the General Court (1801) 9. The House of Representatives responded by stating that it was its "highest wisdom to cherish, and if possible, to improve them [the public schools], and one of our first duties to transmit them unimpaired to our posterity." Answer of the House of Representatives, June 4, 1801, in Resolves of the General Court (1801) 9, 10. The House also agreed that, "[i]f any of the towns or plantations in this Commonwealth are unable to provide the means of instruction for their children, we conceive that the public good requires that they should have such assistance as may be required for this purpose." Id. at 10-11.

Governor John Brooks, in 1819, also articulated the fundamental relation between republican government and public

[61]Governor's Speech, June 4, 1801, in Resolves of the General Court (1801) 7. See Speech of Governor Caleb Strong, June 3, 1800, in 1800-1801 Acts and Resolves of Massachusetts 565, 567 (referring the Legislature to Part II, c. 5, § 2).

[62]Id. at 8.

[63]Id.

education, and the constitutional duty imposed by Part II, c. 5, § 2, to provide for the education of the people: "[T]he conservation of our liberties, as defined in our great social compact, is intimately connected with the intelligence and virtue of the people. But man is born neither wise nor good. Knowledge and virtue result from instruction, and discipline and effort. . . . Hence the usefulness and importance of early tuition; and hence, likewise, the interest which the public has in providing means for cultivating the minds, and forming the manners of youth. Agreeably to these sentiments, the constitution enjoins it as a duty on the Legislature and Magistrates, in all future periods of the Commonwealth, to cherish the interests of literature and the sciences, public schools and grammar schools in the towns. Should the existing laws be found insufficient to provide for the primary education of children, especially of destitute orphans, and the children of the poor and necessitous, prerequisite to their admission into grammar schools, the deficiency has strong claims to the consideration of the Legislature." Governor's Speech, June 1, 1819, in Resolves of the General Court (1819) 27, 28. The Legislature agreed with Governor Brooks. The Senate responded: "[I]t is a truth, not to be forgotten, that political rights have little value, unless accompanied by intelligence and virtue. . . . [L]egislators are obliged . . . to foster and preserve the institutions calculated to diffuse useful knowledge and correct principles; our schools, colleges and churches. . . . [O]ur ancestors made early regulations for the establishment of schools in every part of the Commonwealth, for the instruction of the poor, as well as the affluent; thus encouraging the humblest individual, with the conviction that he was an object of interest to the community, and teaching him that, as his faculties had been developed under the public care, it was his duty to repay the service rendered him, by contributing to the support of similar institutions. . . . Nor ought we to allow advantages so valuable, to yield to the unfavorable influence apprehended from the increase of our population, commerce and wealth. It becomes the Legislature, therefore, to be vigilant, lest the causes of moral deteri-

oration, which have accompanied the progress of refinement, and the establishment of large manufactories in other countries, should gain admission within this Commonwealth." Answer of the Senate, Resolves of the General Court (1819) 32.

The House of Representatives pledged itself to act in accordance with its constitutional duty: "[T]he House of Representatives hold it to be their indispensable duty, as it is their highest interest, to encourage every practicable measure that may be suggested or devised, to carry into effect the requisitions of the constitution, respecting the education of youth." Answer of the House, Resolves of the General Court (1819) 36.

In 1822, Governor Brooks again articulated the intimate connection between the republican form of government which the people of Massachusetts had chosen for themselves and the commitment to public education which is required to sustain that form of government: "The framers of the Constitution were aware that a compact on parchment merely, however definite its checks and provisions, would provide an insufficient preservative to a free government, should the people become indifferent to their own safety, and sink into a state of ignorance and profligacy." Governor's Speech, June 3, 1822, in Resolves of the General Court (1822) 508. "To this point the language of the Constitution is clear and emphatic," continued Brooks, "when it affirms that 'knowledge generally diffused among the people, is necessary for the preservation of their rights and liberties.'" *Id.* at 509. And Massachusetts town schools "in which her sages and statesmen have commenced their career of glory, are calculated to awaken the youthful intellect, to inspire a sense of character, and prepare the great mass of people for understanding and defending their rights." *Id.* Once again, the Legislature responded with an affirmative commitment. The Senate was particularly articulate on the connection between the maintenance of a republic and the education of her citizens: "[T]he general diffusion of knowledge, among all classes of people, is the essential and indispensable basis of a representative re-

public. *The town school is the only proper introduction to the town meeting*" (emphasis added). Answer of the Senate, June 3, 1822, in Resolves of the General Court (1822) at 517. See also Answer of the House of Representatives, June 3, 1822, in Resolves of the General Court (1822) 519, 520. Thus, in all of these early years of our Commonwealth it is clear that the people, the framers, the Legislatures, and the magistrates (Governors) had no doubt that it was their duty to cherish the public schools and that they were enjoined to respond to the constitutional mandate of Part II, c. 5, § 2. The statutes they enacted add further evidence of their fulfilment of this obligation.

2.

The early legislation of the Commonwealth put these ideas into practice. In 1785, the Legislature authorized the townspeople to "grant and vote such sum or sums of money, as they shall judge necessary for the settlement, maintenance and support of . . . schools . . . ; to be assessed upon the polls and property within the same [the town],"[64] and, as indicated, in 1789, the Legislature enacted a comprehensive school law mandating the maintenance of schools in the towns.[65] Like the earlier colonial and provincial laws, the 1789 school law required the towns to maintain schools in proportion with the number of their inhabitants. St. 1789, c. 19, § 1. The statute prescribed penalties for neglect of the law. St. 1789, c. 19, § 6. As in the earlier statutes, the penalty increased with the number of families in the offending town, and the monies collected from payment of the penalties were to be used "for the support of such school or schools" in those towns within the same county as the offending town

---

[64]An Act for regulating towns, setting forth their power, and for the choice of town officers, St. 1785, c. 75, § 7.

[65]An Act to provide for the instruction of youth, and for the promotion of good education, St. 1789, c. 19. The 1789 statute is both a direct descendant of the colonial law of 1647 (discussed, *supra*) and the venerated ancestor of G. L. c. 71, § 1. See G. L. c. 71, § 1 ("Every town shall maintain . . . a sufficient number of schools for the instruction of all children who may legally attend a public school therein").

"whose circumstances most require such assistance." St. 1789, c. 19, § 7.

In addition, the 1789 statute "authorized and empowered" the towns to divide themselves into school "districts." St. 1789, c. 19, § 2. The preamble to this section of the law explained that districts were necessary because "by means of the dispersed situation of the inhabitants of several towns and districts . . . the children and youth cannot be collected in any one place for their instruction." St. 1789, c. 19, § 2, preamble. Also, the statute required students to attain certain levels of proficiency in English before attending grammar school (§ 3); set qualifications for grammar schoolmasters (§ 5); required schoolmasters teaching the very young to obtain a certificate from the selectmen of the town (§ 9); and enjoined ministers and selectmen to "use their influence and best endeavours, that the youth of their respective towns and districts do regularly attend the schools appointed and supported as aforesaid" and to visit and inspect the schools to inquire into regulation and discipline and the proficiency of the students. St. 1789, c. 19, § 7. Last, in a provision which reveals the close relationship between public education and the survival of the republic in the minds of the members of the early Commonwealth (and which remains in effect today as G. L. c. 71, § 30), the 1789 statute directed teachers to instruct children and young people in the "virtues which are . . . the basis upon which the republican Constitution is structured." St. 1789, c. 19, § 4.[66]

---

[66]The 1789 statute enjoined all "instructors of youth" in the State "to exert their best endeavours, to impress on the minds of children and youth committed to their care and instruction, the principles of piety, justice, and a sacred regard to truth, love to their country, humanity and universal benevolence, sobriety, industry and frugality, chastity, moderation and temperance, and those other virtues which are . . . the basis upon which the republican Constitution is structured." St. 1789, c. 19, § 4. It also mandated: "[I]t shall be the duty of such instructors, to endeavour to lead those under their care (as their ages and capacities will admit) into a particular understanding of the tendency of the beforementioned virtues, to preserve and perfect a republican Constitution, and to secure the blessings of liberty, as well as to promote their future happiness; and the tendency of the opposite vices to slavery and ruin." *Id.*

In *Commonwealth* v. *Dedham*, 16 Mass. 141 (1819), this court considered the requirements of the 1789 statute. A grand jury had issued an indictment against the inhabitants of the town of Dedham charging them with failing to maintain a grammar school "in subversion of that diffusion of knowledge, and in hindrance of that promotion of education, which the principles of a free government require, and which the constitution of the commonwealth enjoins; against the peace and dignity of said commonwealth, and the form of the statute in such case made and provided [St. 1789, c. 19]." *Id.* The town defended on the basis that it employed a grammar school master in *one* of its "town or district schools." This court emphatically rejected Dedham's defense: "The schools required by the statute [St. 1789, c. 19] are to be maintained for the benefit of the whole town, as it is the wise policy of the law to give all the inhabitants equal privileges, for the education of their children in the public schools. *Nor is it in the power of the majority to deprive the minority of this privilege.* If, then, the schools in three of the districts are to be considered as grammar schools, and those in the other districts as of another description, the whole proceedings of the town have been irregular; and it may well be doubted, whether the money of the town can be lawfully appropriated to the support of schools thus instituted. *Every inhabitant of the town has a right to participate in the benefits of both descriptions of schools* [reading and writing schools and grammar schools]; and it is not competent for a town to establish a grammar school for the benefit of one part of the town, to the exclusion of the other; although the money raised for the support of schools may be, in other respects, fairly apportioned. If the whole of the money so raised by the defendants had been expended in three districts, no one would contend for the legality of such an appropriation. Yet the principle of the present case is the same. For the two descriptions of schools are to be considered as distinct and independent of each other. Both must be town schools, and not schools for the benefit of a part of the town only." (Emphasis supplied.) *Commonwealth* v. *Dedham, supra* at 146.

In the years following 1789, a variety of school laws were enacted. The Legislature authorized the inhabitants of towns to raise money to repair schoolhouses, and to purchase land and buildings for new schoolhouses; mandated a district taxing system (for those towns that had subdivided into districts for school purposes as authorized by the 1789 law); and enacted various other provisions concerning the system of public schools in the Commonwealth.[67] In 1826, the Legislature required each town to elect a school committee, charged each school committee with specified duties, and instituted a report or "return" to the Secretary of the Commonwealth. St. 1826, c. 170. By its return, a school committee was required to report annually on a number of topics, including: the amount spent the preceding year "for the instruction of youth"; the number of pupils in the town (divided into three, groups — those under seven, those between seven and fourteen, and those over fourteen years of age); the number of pupils between seven and fourteen years old, if any, who do not attend school; and the number of persons over fourteen and under twenty-one "who have had a right to education in the public schools in this Commonwealth, who are unable to read or write." *Id.* at §§ 5, 6.

---

[67]See, e.g., St. 1800, cc. 8, 9; St. 1802, c. 11; St. 1811, c. 24 (authorizing town assessors to "remit sums of money assessed on the inhabitants of any School District, for the purpose of purchasing, building, repairing or furnishing school houses, as they have to remit any sums of money assessed on the inhabitants of any town or district, for defraying town or district expenses"); St. 1815, c. 141 (authorizing a town as a whole to override a decision of a town district not to raise money to build or repair a schoolhouse within the district, and providing that in the event of a town override, the money to build or repair the schoolhouse is to be assessed against the members of the district). See also St. 1817, c. 14; St. 1822, c. 99; St. 1824, c. 111 (authorizing towns of fewer than 5,000 inhabitants to hire a teacher to instruct youth in "Orthography, Reading, Writing, Arithmetic, English Grammar, Geography and good behavior" rather than, as previously required, in Latin and Greek, and authorizing such towns to apportion the money for the support of the public schools "to be applied for the support of such schools in the several districts in such town, in such manner as the town may judge to be best for the instruction of their youth" provided the town maintained the public schools in the town for the time periods required by law). ·

In 1827, the Legislature repealed the existing statutes and enacted a new comprehensive school law. St. 1827, c. 143. The 1827 statute consolidated, amended, and added to the previous school provisions. Thus, it required each town or district to maintain schools to teach specified subjects for specified periods of time, according to the number of inhabitants in the town or district (St. 1827, c. 143, § 1); authorized — but did not require — towns to subdivide into districts for school purposes (*id.* at § 2); enjoined teachers to instruct youth in the virtues "upon which the Republican Constitution is founded" (*id.* at § 3); "authorized, empowered and directed" the towns to raise money for the support of schools (*id.* at § 4); mandated the election of a school committee in each town and specified the duties of school committees (*id.* at § 5)[68]; mandated the creation of "prudential" committees in towns subdivided into districts, and specified their duties (*id.* at § 6)[69]; instituted a system for providing students with school books (*id.* at § 7)[70]; required the

---

[68]The school committees were to take "general charge and superintendence" of the public schools in the town; to require evidence of the fitness of teachers and to issue certificates of such fitness; to determine the number of students attending the town-wide school; to make quarterly visits to the town-wide school to ensure that students were "properly supplied with books" and to "enquire into the regulation and discipline" of the school and the "habits and proficiency" of the students; to visit the district schools in the town for the same purposes at the beginning and end of the term; and to visit "all the schools kept by [the] town" once a month "without giving previous notice thereof to the instructors." St. 1827, c. 143, § 5.

[69]The prudential committees were to keep the district school house in good order; if there were no school house, they were to find a "suitable place" for the school in the district; to "provide fuel, and all things necessary for the comfort" of the students; to select and contract with a teacher in the district; and to provide information and assistance to the school committee of the town. St. 1827, c. 143, § 6.

[70]The school committee was to "direct and determine the class books to be used in the respective classes, in all the several schools kept by [the] town" (except that it could "never direct" the purchase or use of books "calculated to favour any particular religious sect or tenet"), to purchase the books at town expense, and to sell them, at cost, to the parents, guardians, or masters of the students who were to provide them to the students. In the event that the parent, master, or guardian did not supply a student with books, the school committee was directed to supply the student with

school committees to make annual reports to the Secretary of the Commonwealth (*id.* at §§ 8, 9)[71]; empowered the towns or districts within the towns to raise money to build, repair, or purchase a school house (and to purchase land) (*id.* at § 10); prescribed a school district taxing system (*id.* at §§ 11, 12, 13); specified the procedures by which meetings in the districts were to be called (*id.* at § 14); granted the towns certain powers over the districts (*id.* at §§ 16, 17); made each school district in the Commonwealth "a body corporate" with specified powers and liabilities (*id.* at § 17); and, last, prescribed penalties for a town's refusal to raise money for the support of schools or to choose a school committee or prudential committees, and directed that such penalties were to be used for the support of schools in the town (*id.* at § 19).[72]

In 1834, the Legislature created the "Massachusetts School Fund," a "permanent fund for the aid and encouragement of common schools." St. 1834, c. 169, § 1. Public monies from two sources were appropriated to create the fund:

---

books at the expense of the town and to notify the town assessors of the names of the parent, master, or guardian who had failed to provide the student with books. The town assessors were then directed to add the cost of the books to the next annual tax levied on the delinquent parent, master, or guardian. However, if the assessors determined that the parent, master, or guardian was "not able, and cannot afford to pay the whole expense of the books so supplied on their account," the latter was "exonerated from the payment of the whole or part of such expense." St. 1827, c. 143, § 7.

[71]This provision continued the requirement of annual returns which had been instituted one year earlier, in St. 1826, c. 170, §§ 5, 6.

[72]Any town which refused or neglected "to vote and raise money for the support of schools" was assessed a penalty in the amount of "a sum equal to twice the highest sum which such town had ever voted to raise for the support of schools therein"; and any town which failed to choose a school committee or prudential committees was assessed an amount between $100 and $200. Three-quarters of the money paid in penalties was to be paid to the school committee of the town (or if there were no school committee, to the selectmen of the town) and was to be used for the support of the schools in the town.

monies from the sale of public lands in Maine,[73] and monies recovered by the State in its claim against the United States for military services rendered. The same year the Legislature created this State-wide fund for the support of public schools, Governor Davis addressed the Legislature on the topic of public education. Echoing the themes which had animated the framers of the Constitution and the first legislators and magistrates of the Commonwealth, he declared that the people of Massachusetts owed the early colonial settlers "a debt of never ending gratitude for establishing free schools to be maintained at the public expense," and he continued: "The great wisdom evinced in thus boldly striking out a course of public policy which required the rich to aid in educating the poor, and which is rapidly tending to revolutionize the world, has not been wasted upon their posterity, for free schools have ever since been cherished and maintained as the nurseries of virtue and liberty. So deeply imbued with this attachment was the public mind when the Constitution of the State was framed, that one of its sections, in language of singular beauty, enjoins on those who administer the government the duty of promoting the diffusion of knowledge as the basis of civil liberty."[74]

---

[73]The statute appropriated to the Massachusetts School Fund all monies which had been obtained previously from the sale of public lands in Maine, along with fifty per cent of all monies which would be obtained in the future from such sales. St. 1827, c. 169, § 1. In 1820, Maine had separated from Massachusetts and become a separate State; upon the separation, State lands in the newly created State of Maine were divided equally between Massachusetts and Maine. See generally Hatch, Separation of Maine (1784-1820), in 3 Commonwealth History of Massachusetts 548-579 (A.B. Hart ed. 1929).

[74]Governor's Address, Jan. 21, 1834, in 1834 Resolves of the General Court 569, 575-576. Governor Davis described the virtues of the public schools: "In these institutions which are open with all their privileges to all persons, even to the pauper who lives upon public charity, superiority in intellectual advancement constitutes the only distinction. Here the love of intellectual pursuits springs up; here the morals are strengthened and often purified; and here is laid the foundation of the future eminence and usefulness of most of our citizens. . . . Free schools are emphatically the seminaries of the people, and, like the natural sun in the firmament, shed their animating and vivifying influences upon all." *Id.* at 576. He heralded the

3.

Statements by legislators and magistrates made long after the adoption of the Constitution, unlike those made at the time of the Constitution's adoption or shortly thereafter, have little probative value as indications of the contemporary understanding of the Constitution in 1780. Despite this limitation, however, we note here the statements of a 1919 Report of the Special Commission on Education, because of their pertinence to the precise issues in this case. The special commission was created by resolve of the General Court and was composed of members of the Legislature and appointees of the Governor. The special commission was charged with investigating the State's educational systems and making recommendations for the "proper co-ordination of public education within the commonwealth." Its work resulted in the enactment of An Act to provide for the distribution of a portion of the income tax, and of the income of the Massachusetts school fund, for the purpose of improving the public schools, St. 1919, c. 363.

The special commission found wide disparities in the educational opportunities available to students across the State and stated: "To the reader of this report who takes comfort in the thought that his city or town is now taxing for maintenance of schools all it can possibly afford, and is on the whole doing pretty well by its unfortunates . . . it would be a rather disconcerting revelation to visit the poorer cities, the struggling towns and sparsely settled rural sections of the State, and see how large a number of boys and girls of the Commonwealth are being denied the equal opportunity for an education which chapter V, section II, of the Massachu-

---

"auspicious influence of the example of Massachusetts in asserting the principle, that the rich ought to contribute to the education of the poor. It was left to her to develope this great source of moral power, whose influence is seen, in opening the avenues to knowledge, in dispelling the intellectual night that would otherwise overshadow the poor, and in achieving for them, and all the great laboring class of citizens, new privileges and new sources of happiness. Its influence is not less conspicuous in sustaining every where the institutions which we most value." *Id.* at 576-577.

setts Constitution guarantees." Report of the Special Commission 27 (1919).

The special commission recommended the creation of a general school fund in the Commonwealth, supported by income tax, which would be "distributed to all cities and towns so as to assist them in supporting education and equalizing educational opportunities." Report of the Special Commission, *supra* at 20. See *id.* at 54-57.[75] In addition, the special commission recommended a new formula for distributing the income of the Massachusetts School Fund which "takes into consideration the actual needs of the town and its valuation." *Id.* at 21. See *id.* at 57-58.

The special commission did not mince words in describing the need for these measures: "[N]o state probably can show a greater diversity among the towns and cities with respect to their financial ability to maintain schools [than Massachusetts], and no state can produce a social and industrial situation that makes more necessary a high level of general education throughout all communities." *Id.* at 29. The Report described the early commitment to public education in Massachusetts and noted that "[i]n earlier days, when wealth was more evenly distributed over the State, the system [of local funding] was not seen at its worst." *Id.* at 30. Now, however, the need for "equalizing educational opportunity" (*id.* at 29) across the towns was acute: "[W]hile Massachusetts has some of the best schools in the country, she also has some of the poorest." *Id.* at 31. Lastly, the Commission gave its view that "[t]he excellence of schools depends in large measure upon the amount of money spent upon them." *Id.*

---

[75]This recommendation for a State-wide fund for education from monies raised through the income tax (and the Act adopting the recommendation) came four years after the ratification in 1915 of a constitutional amendment granting the General Court "[f]ull power and authority . . . to impose and levy a tax on income . . . ." Art. 44 of the Amendments to the Massachusetts Constitution.

### E.

In none of our prior cases have we had occasion to consider whether Part II, c. 5, § 2, imposes a duty on "legislatures and magistrates" to provide an adequate education to the young people of the State. Our cases are, however, consistent with the view that the section imposes such a duty. In a series of cases, this court has held that various actions of the Legislature accorded with the "duty" imposed on it by Part II, c. 5, § 2, and has characterized the duty as the "public obligation to provide for general education." *Nicholls* v. *Mayor & School Comm. of Lynn*, 297 Mass. 65, 68 (1937). There we stated: "In the performance of the obligation thus imposed on the Commonwealth" by Part II, c. 5, § 2, it was "within the competency of the General Court" to enact a statute "requiring the flag salute and the pledge of allegiance" in the public schools. *Id.* at 69. In *Antell* v. *Stokes*, 287 Mass. 103, 105-106 (1934), we declared: "Education of youth was provided at public expense and with anxious solicitude through the colonial and provincial periods of our history. The duty to maintain and cherish public schools was declared in the Constitution, c. 5, § 2." Further, we noted that the General Court had taken "jealous care" to clothe "municipal officers with adequate authority to encourage the highest practicable efficiency of the system of public education," *id.* at 106; and, that, therefore, the Haverhill school committee was fully empowered to issue and enforce a rule forbidding public high school students from participating in secret societies. Similarly, in *Commonwealth* v. *Interstate Consol. St. Ry.*, 187 Mass. 436 (1905), aff'd, 207 U.S. 79 (1907), the court declared that Part II, c. 5, § 2, of the Constitution "justified" the Legislature's passage of a statute requiring street railway companies to transport public school children to and from school at half fare: "The duty of legislatures and magistrates to be diligent in the promotion of education, among all the people, is specially declared in c. 5, § 2," and the statute at issue "merely gives help to [the] pupils in connection with their acquisition of knowledge." *Id.* at 439. See *Merrick* v. *Amherst*, 12 Allen 500, 503 (1866)

(in accepting a grant of Federal lands to be used for an agricultural college in the State, "the legislature not only acted strictly within its constitutional authority, but also in accordance with the duty enjoined upon it by an express provision of the constitution, c. 5, § 2").

Moreover, in *Lynch* v. *Commissioner of Educ.*, 317 Mass. 73 (1944), in the course of holding that Part II, c. 5, § 2, does *not* require the Commonwealth to provide free education in State teachers colleges, the court stated in effect that the provision *does* require the Commonwealth to provide free education in the elementary and secondary public schools: "There is nothing in the contention of the plaintiffs that [Part II, c. 5, § 2] provides for free education *not only* in common schools but also in higher institutions of learning such as teachers colleges" (emphasis added). *Id.* at 76. " 'Common schools' or 'public schools,' " we stated, "embrace only the grade schools and high schools." *Id.* Much earlier, in *Jenkins* v. *Andover*, 103 Mass. 94, 97 (1869), the court wrote that Part II, c. 5, § 2, "requires the legislature and the magistrates, among other things, to 'cherish' 'public schools and grammar schools in the towns,' " and that Part II, c. 5, § 2, "clearly refer[s] to the [system of common schools], and solemnly testif[ies] to their importance in maintaining a system of popular government, which shall secure not only peace and order, but individual freedom and elevation of character."[76] More recently, in *Care & Protection of Charles*, 399 Mass. 324, 335 (1987), in balancing the rights of parents to educate their children at home against the State's interest in educating its young citizens, we held

---

[76]*Jenkins* v. *Andover*, 103 Mass. 94 (1869), concerned the definition of the term "public schools" in art. 18 of the Amendments to the Massachusetts Constitution. The court ruled that it "included all schools, from those lower than grammar schools to those commonly known as high schools, established and maintained in the several cities and towns as part of the general system of popular education" and that the term was "synonymous with 'common schools,' in the broadest sense." *Jenkins* v. *Andover, supra* at 98. The Punchard Free School in Andover, which was under the direction of eight privately appointed trustees, rather than under the direction of public officials, was not a "public school." *Id.* at 101-103.

that Part II, c. 5, § 2, "proclaims the State's interest in ensuring that its citizens are educated." *Id.*[77]

The defendants place considerable weight on *Cushing* v. *Newburyport*, 10 Met. 508 (1846). In *Cushing*, the question was whether the power of towns to tax themselves to support schools was limited to the power to raise money to support only the number and type of schools which they were required by State statute (Rev. Sts. [1836] c. 23, §§ 1-6) to maintain, or whether they could tax themselves to support additional schools. The court held that the statute requiring towns to maintain a specified number of schools merely set a minimum on the number of schools the town could maintain, and that the towns could tax themselves to support more schools than they were *required* to maintain. While the case involved a matter of statutory interpretation, the court interpreted the statutes "under the strong light cast upon them by the just, and liberal, and enlightened views of the founders of our Commonwealth, in the state constitution, c. 5 , § 2." *Cushing, supra* at 511. The court stated that Part II, c. 5, § 2, "announce[s], in clear and energetic terms, the object of that constitution to establish a free government sustained by an enlightened, intelligent and educated people; that this should extend, as far as practicable, to all classes of the people; and for this purpose it is made the duty of the legislature who make the laws, and of the magistrates who may expound them, to cherish the interests of literature (among other means) by public schools and grammar schools, in the

---

[77]We also described the State interest in educating its citizens in the history of State statutes governing education: "[F]rom the beginning of its history, the Commonwealth has emphasized the crucial importance in the education of children." *Care & Protection of Charles*, 399 Mass. 324, 335 (1987). The "great object of these provisions of the statutes has been that all children shall be educated," *id.* at 336, quoting *Commonwealth* v. *Roberts*, 159 Mass. 372, 374 (1893). "The state interest in this regard lies in ensuring that the children residing within the State receive an education." *Id.* We held in *Care & Protection of Charles, supra* at 336, that a school committee may impose and enforce on home education "certain reasonable educational requirements similar to those required for public and private schools."

towns." *Cushing, supra* at 512. Under this "strong light," the court determined that the towns were free to raise money to support more schools than they were, by statute, required to maintain, provided, however, that schools were *"town* schools and designed for general education of all the people" (emphasis in original). *Cushing, supra* at 513.[78]

We perceive nothing in either the logic or the holding of *Cushing* to support the defendant education officials' argument that Part II, c. 5, § 2, does not impose a duty on "legislatures and magistrates" to provide for the education of the children of the Commonwealth. To the contrary, the decision that the statutes permitted the towns to raise money for schools beyond those which they were expressly required to maintain as long as the additional schools were "designed for the general education of *all* the people" supports the argument that the Constitution requires Legislatures and magistrates to provide for the education of the people — *all* the people.

Nor are we detained by our decision in *McNeely* v. *Board of Appeal of Boston*, 358 Mass. 94 (1970). There, we held that Part II, c. 5, § 2, of the Constitution afforded Suffolk University no special exemption, as an educational institution, from the Boston Zoning Code. While we stated in that case that the Part II, c. 5, § 2, "has never been cited as a constitutional command forbidding or requiring specific legislative action," *id.* at 104, our holding was limited to the determination that the section had no force in the zoning controversy before the court.

---

[78]The court reasoned that "[t]he sum required to be raised" by the statute was not "proportioned to the numbers to be educated," and observed that "it must have been as manifest to towns as to the legislature, that a provision quite adequate to the exigencies of one town would be quite inadequate to those of another." *Cushing* v. *Newburyport*, 10 Met. 508, 519 (1846). The statute requiring the towns to maintain schools set the number of required schools according to the number of families in the town, and the largest town it provided for was one of 500 families, yet some towns were composed of many more than 500 families. *Id.* at 518.

### F.

We have reviewed at great length the history of public education in Massachusetts so that we might glean an understanding of the meaning of c. 5, § 2. In doing so, we have considered the history of the colony and the province, the condition and concepts relating to education underlying the drafting of the Constitution of the Commonwealth and, in particular, c. 5, § 2. We have examined the intention of the framers, the language and the structure of the Constitution, the ratification process by the towns and also the words, acts, and deeds of contemporaries of that time, and, especially the views, addresses, and statutes of early Governors (magistrates) and the Legislatures. In this light, we have considered the proper meaning of the words "duty" and "cherish" found in c. 5, § 2. What emerges from this review is that the words are not merely aspirational or hortatory, but obligatory. What emerges also is that the Commonwealth has a duty to provide an education for *all* its children, rich and poor, in every city and town of the Commonwealth at the public school level, and that this duty is designed not only to serve the interests of the children, but, more fundamentally, to prepare them to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts.

This duty lies squarely on the executive (magistrates) and legislative (Legislatures) branches of this Commonwealth. That local control and fiscal support has been placed in greater or lesser measure through our history on local governments does not dilute the validity of this conclusion. While it is clearly within the power of the Commonwealth to delegate some of the implementation of the duty to local governments, such power does not include a right to abdicate the obligation imposed on magistrates and Legislatures placed on them by the Constitution.

We now turn to the remaining questions before us. In so doing, we consider briefly the statutory structures pertaining to the administration of the public schools and to the funding schemes presently utilized. Ultimately, we must decide two

additional fundamental questions. First, what does the constitutional mandate entail? Second, on this record is that mandate being violated?

We shall then conclude by a brief discussion of what remedies may be appropriate for this court to require.

## IV

We turn now to a description of the statutory schemes pertaining to the present interrelationship of the State and local governments in regard to education in the public schools. Much of what we shall set forth is a reprise of the long history of this Commonwealth, as we have already described it. Having concluded that the duty to educate is an enforceable one which rests on the Commonwealth, we describe the administrative and financial schemes as they presently exist. This we deem necessary so we may determine whether the duty we have described is being violated.

### A.

1. *Administrative structure of the Commonwealth's public school system.* The Legislature has enacted a complex of statutes that identify, assign, and mandate various responsibilities related to public education. See generally G. L. c. 15; G. L. c. 69; G. L. c. 76. While we do not purport to canvass all the statutes, we note here briefly the broad outlines of the existing legislation.

The requirement to maintain public schools is assigned to the towns and cities of the Commonwealth: Every town or city in the Commonwealth is required to maintain "a sufficient number of schools for the instruction of all children who may legally attend a public school therein." G. L. c. 71, § 1.[79] See G. L. c. 71, § 4 (requiring towns of 500 householders or more to maintain a high school, unless exempted). Towns and cities must "provide and maintain a sufficient number of schoolhouses, properly furnished and conveniently

---

[79]General Laws c. 71, § 1, is a direct descendant of St. 1789, c. 19, and, that, in turn, was a descendant of the 1647 law that required the towns to maintain schools.

situated for the accommodation of all children therein entitled to attend the public schools." G. L. c. 71, § 68. Two or more towns or cities may join together to form a regional school district to meet these responsibilities. See G. L. c. 71, §§ 14-15.

"General charge" of the public schools in each town, city, or regional school district is assigned to a locally elected school committee in each community. G. L. c. 71, § 37. The Legislature has identified and mandated the specific duties and powers of the school committees. See, e.g., G. L. c. 71, §§ 37-67. These include the appointment of a superintendent of schools (G. L. c. 71, §§ 59, 59A), principals for each of the schools in the district (G. L. c 71, § 59B), and teachers and aides (G. L. c. 71, § 38). In addition to hiring decisions, the school committees are charged with compensation, tenure, and removal decisions. See G. L. c. 71, §§ 40-42.

To guide and oversee public education in the schools and to set State-wide policy and requirements, the Legislature has created State administrative structures. The Board of Education (board), which dates from 1837,[80] was created to "support, serve, and plan general education in the public schools." G. L. c. 15, § 1G, first par. See G. L. c. 15, § 1E. The Legislature has charged the board with a range of broad planning, support and coordination responsibilities,[81] educa-

---

[80]See St. 1837, c. 241.

[81]See G. L. c. 15, § 1G, as amended through St. 1992, c. 414, § 1. The board "shall provide centralized, State wide, long-range planning service for public schools" (fourth par.); and "may provide such necessary services to local public schools as are beyond their capacity to support separately (third par.). The board "shall be a communication and information center serving all public schools" (second par.); "shall provide a common center for the development, evaluation, and adaptation of educational innovations for public schools" (fifth par.); and shall "delineate and locate such other supporting services so as to improve the operation of all public schools and the quality of their educational programs" (ninth par.). The board "may collect and maintain information from any public school system" (twenty-ninth par.), and it "shall see to it that all school committees comply with all laws relating to the operation of the public schools" and "in the event of noncompliance the commissioner of education shall refer all such cases to the attorney general of the commonwealth for appropriate action to obtain compliance." G. L. c. 15, § 1G, twenty-fifth.

tion standard setting duties,[82] duties regarding State aid to schools,[83] and numerous other powers and responsibilities which are specified in provisions throughout, inter alia, G. L. c. 15, c. 71, c. 71A, c. 71B, c. 72, and c. 76.[84]

The Legislature has also created a Department of Education, which is under the supervision and control of the board (G. L. c. 15, § 1), and is headed by the Commissioner of Education. The Commissioner serves as the board's secretary and chief executive officer and as the chief State officer for elementary and secondary education. G. L. c. 15, § 1F. The Commissioner has "supervision of all educational work supported in whole or in part by the commonwealth." G. L. c. 69, § 1. The board is charged with establishing divisions in the areas of curriculum and instruction, administration and personnel, research and development, school facilities and related services, State and Federal assistance, occupa-

---

[82]The board is required by G. L. c. 15, § 1G, to establish the minimum length of a school day and the minimum number of school days in a school year (tenth par.); the "maximum pupil-teacher ratios for classes in public elementary and secondary schools" (twelfth par.); the "permissible and mandatory ages for school attendance" (thirteenth par.); the "minimum educational standards for all courses which public schools require their students to take" (fourteenth par.); and the "minimum standards for all public school buildings" (fifteenth par.). The board is charged with setting criteria for a minimum State standard for school districts (twenty-second par.); developing education plans to meet State needs (board is the planning and approving authority for Federal education programs in the Commonwealth) (twenty-fourth par.); establishing guidelines and standards for the development of school budgets (eighth par.); approving "the educational standards for appointments for professional personnel in the public schools" (eleventh par.); and promulgating regulations "which establish the principles to be used by school committees for the evaluation of teachers and administrators" (thirty-seventh par.). See also *Board of Educ.* v. *School Comm. of Quincy, ante* 240, 246 & n.7 (1993).

[83]The board is required under G. L. c. 15, § 1G, to evaluate annually the efficacy of the State aid formula and recommend changes as necessary (twentieth par.) and it is authorized to "withhold state and federal funds from school committees which fail to comply with the provisions of law relative to the operation of public schools or any regulation of said board authorized" in G. L. c. 15, § 1G (twenty-first par.).

[84]These include, for example, the authority to grant provisional and permanent certificates to teachers, principals, and a range of other education professionals. G. L. c. 71, § 38G.

tional education, special education, and educational person-
nel. G. L. c. 15, § 1F, first par. The Legislature has also
created an advisory council on education; the council's pur-
pose is "to recommend policies designed to improve the per-
formance of all public education systems in the common-
wealth." G. L. c. 15, § 1H. The council is charged with the
duty, among others, to "recommend such policies as will pro-
mote and facilitate coordination, effectiveness and efficiency
in the operation of all public education systems in the com-
monwealth." *Id.*

In addition to identifying, assigning, and mandating re-
sponsibilities related to public education, the Legislature has
itself addressed numerous issues concerning public education.
Thus, for example, G. L. c. 71, §§ 1 and 2, mandate basic
curriculum requirements in the schools[85]; G. L. c. 76, § 1,
contains compulsory school attendance requirements; G. L.
c. 71A addresses transitional bilingual education; G. L.
c. 71B concerns special education programs for children with
special needs; and G. L. c. 74 addresses vocational education.

As this brief sketch of the statutes demonstrates, the Leg-
islature has recognized its constitutional duty to provide for
the education of the populace. Whether what the Legislature
has done is sufficient to fulfil that constitutional duty is, of
course, another matter. We recognize, however, that the de-
tails of implementation of such a duty are best left, at least
initially, to the executive and to the legislative branches of
government. Thus, it is generally within the domain of the

---

[85]Schools "shall give instruction and training in orthography, reading,
writing, the English language and grammar, geography, arithmetic, draw-
ing, music, the history and constitution of the United States, the duties of
citizenship, health education, physical education, and good behavior."
G. L. c. 71, § 1. In addition, "[i]n all public elementary and high schools
American history and civics, including the constitution of the United
States, the declaration of independence and the bill of rights, and in all
public schools the constitution of the commonwealth and local history and
government, shall be taught as required subjects for the purpose of pro-
moting civic service and a greater knowledge thereof, and of fitting the
pupils, morally and intellectually, for the duties of citizenship." G. L.
c. 71, § 2. See also G. L. c. 71, § 30.

"legislatures and magistrates" to determine how they will fulfil their duty under Part II, c. 5, § 2. In fulfilment of their duty, they may, as they have done, assign some responsibilities for education to the local communities of the Commonwealth. At all times, however, the ultimate responsibility for educating the public belongs to the "legislatures and magistrates." If the mandate of the Constitution is not met, or if a statutory structure which worked at one time no longer works, the responsibility for the failure to educate falls squarely on the Commonwealth, specifically the "legislatures and magistrates." They may delegate, but they may not abdicate, their constitutional duty. "Without in any way attempting to invade the rightful province of the Legislature to conduct its own business, we have the duty, certainly since *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 178 (1803), to adjudicate a claim that a law and the actions undertaken pursuant to that law conflict with [or fall short of] the requirements of the Constitution. 'This,' in the words of Mr. Chief Justice Marshall, 'is of the very essence of judicial duty.' " *Colo* v. *Treasurer & Receiver Gen.*, 378 Mass. 550, 553 (1979). See *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629, 642 (1981). See also *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 244 (1946).

2. *The public school funding scheme.* As presently constituted, funding for the public schools comes from three sources: local monies, State monies, and Federal monies. Federal monies account for only four to five per cent of the total expenditures, and are generally targeted for specific programs. Local monies are monies assessed, collected, and used locally. The main source of local funds is the local property tax. General Laws c. 71, § 34, provides that "[e]very city and town shall annually provide an amount of money sufficient for the support of the public schools as required by [c. 71], provided, however, that no city or town shall be required to provide more money for the support of the public schools than is appropriated by vote of the legislative body of

the city or town."[86] In each town or city, the school commit-
tee prepares an annual budget request for the schools, which
the local appropriating authority then votes on, along with
requests to appropriate funds for a wide variety of municipal
services such as police and fire protection and public health.
See generally regarding cities G. L. c. 44, § 31A (submis-
sion to mayor); G. L. c. 44, § 32 (submission from mayor to
city council and vote by city council); regarding towns G. L.
c. 41, § 59 (submission to appropriation, advisory, or finance
committee); G. L. c. 41, § 60; G. L. c. 39, § 16 (town
budget prepared and made available to town inhabitants);
G. L. c. 40, § 5 (town meeting vote on town budget).

The setting of local property tax rates is a complex process
involving both local and State officials. See generally *An-
drade* v. *City Council of Gloucester*, 406 Mass. 337, 340-341
(1989). Local tax rates must be approved by the Commis-
sioner of Revenue, and no local rate is fixed until such ap-
proval is obtained. G. L. c. 59, §§ 21D and 23. General
Laws c. 59, § 21C (*b*), inserted by the initiative proposal
known as "Proposition 2½," limits the amount of local taxes
which any city or town may assess in a given fiscal year to
two and one-half per cent of the full and fair cash valuation
of the real and personal property in such city or town. *Mas-
sachusetts Teachers Ass'n* v. *Secretary of the Common-
wealth*, 384 Mass. 209, 215 (1981). While the local appro-
priating authority may seek voter approval to appropriate
specified amounts above the two and one-half per cent limit
for specified purposes, a two-thirds vote of the voters at a
general election is required for such an "override." See G. L.
c. 59, § 21C; *Massachusetts Teachers Ass'n* v. *Secretary of
the Commonwealth*, *supra* at 216. The Commissioner of
Revenue is responsible for determining the total limit on lo-
cal taxes for each of the Commonwealth's towns and cities,

---

[86]The proviso to § 34 was inserted by the initiative and referendum peti-
tion known as Proposition 2½, St. 1980, c. 580, § 7. See generally *Massa-
chusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass.
209 (1981). By the addition of this proviso, Proposition 2½ abolished the
fiscal autonomy of school committees. See *id.* at 216.

and may not approve a tax rate for any city or town which would "allow the amount of property taxes levied to exceed the limit" on local taxes. G. L. c. 59, § 21D.

The second source of funds for public schools is "State aid." General Laws c. 70 specifies a formula for determining the amount of State aid to be granted annually to each town or city (§§ 2-6) and states that the "purpose of the financial assistance provided by this chapter shall be to promote the equalization of educational opportunity in the public schools of the commonwealth, to reduce the reliance upon the local property tax in financing public schools, and to promote the equalization of the burden of the cost of school support to the respective cities, towns, regional school districts and independent vocational schools." G. L. c. 70, § 1. The parties have stipulated, however, that since 1984, State aid to schools has not been determined according to the c. 70 formula, but instead through the annual appropriations process.[87]

In addition to the annual appropriation of State aid (which — even though it is no longer determined according to c. 70 — is termed "Chapter 70 Aid" and "Additional Assistance"), some municipalities receive additional State monies through the equal educational opportunity grant program. See G. L. c. 70A.[88] "The purpose of the equal educational opportunity grant . . . is to accelerate the achievement of the objectives set forth in [G. L. c. 70, § 1] . . . ." G. L. c. 70A, § 1. Under G. L. c. 70A, as enacted, grants are to be awarded to towns and cities whose total direct service ex-

---

[87]See the following appropriations acts: St. 1984, c. 234, § 3 (overriding c. 70 formula by specifying cap on each municipality's c. 70 aid); St. 1985, c. 140, § 3 (same); St. 1986, c. 206, § 3 (same); St. 1987, c. 199, § 3 (stating that, for fiscal year 1988, notwithstanding the provisions of any general or special law to the contrary, the amounts as specified in § 3, to be distributed under line item 7061-0008 as school aid, are in full satisfaction of amounts due under G. L. c. 70, §§ 3, 6, 7); St. 1988, c. 164, § 3 (same); St. 1989, c. 240, § 3 (same); St. 1990, c. 150, § 3 (same); and St. 1991, c. 138, § 3 (same).

[88]General Laws c. 70A derives from St. 1985, c. 188 ("An Act improving the public schools of the Commonwealth"), which also provided for a variety of other specific State grants.

penditures on schools (combining local and State funds) are less than eighty-five per cent of the State average of such expenditures (the average of all the towns and cities of the Commonwealth). See G. L. c. 70A, §§ 3-5. For six years, starting in 1985, such towns and cities were to be awarded one-sixth of the difference between the eighty-five per cent figure and their actual expenditure. *Id.* The parties have stipulated that in fiscal year 1991, local aid (including both "Chapter 70 Aid" and the equal educational opportunity grants) was reduced by four per cent, and in fiscal year 1992, the same was reduced by twenty per cent. In addition, in fiscal year 1992, emergency funding legislation was enacted. St. 1991, c. 493.

### B.

The defendants argue before us that, if one looks to the administrative and financing schemes now in effect, that one must conclude, even if a constitutional duty is found, that the defendants are meeting their constitutional mandate. We disagree. The essential facts are not in dispute and we are entitled to draw our own proper inferences from them. We need not conclude that equal expenditure per pupil is mandated or required, although it is clear that financial disparities exist in regard to education in the various communities. It is also clear, however, that fiscal support, or the lack of it, has a significant impact on the quality of education each child may receive. Additionally, the record shows clearly that, while the present statutory and financial schemes purport to provide equal educational opportunity in the public schools for every child, rich or poor, the reality is that children in the less affluent communities (or in the less affluent parts of them) are not receiving their constitutional entitlement of education as intended and mandated by the framers of the Constitution.

For this conclusion, we need look no further than the parties' stipulations and the record appendix to conclude that the Commonwealth has failed to meet its constitutional obligation. In these documents, which include extensive stipulations, reports, and affidavits of education professionals (some

of them defendants or former defendants in this case), we find statement after statement recounting the Commonwealth's failure to educate the children in the plaintiffs' schools and those they typify. The Commonwealth has not directed us to, nor have we discovered, any statements in the record tending to show otherwise. We briefly review the relevant portions of the record.[89]

In their 1991 Report of the Committee on Distressed School Systems and School Reform, the defendant members of the board speak of a "state of emergency due to grossly inadequate financial support," and admit that "[c]ertain classrooms simply warehouse children at this time, with no effective education being provided."[90] Arguably, this admission, by itself, suffices to establish the constitutional violations, but there is more. Harold Raynolds, Jr., the former Commissioner of Education (and a former defendant) has stated that "[i]n many of the communities in Massachusetts, particularly less affluent communities such as the ones in which the plaintiffs attend school, Massachusetts is failing — and failing more than ever before — to achieve [the] goal [of providing every child with an opportunity for success in learning]." Peter Finn, the Executive Director of the Massachusetts Association of School Superintendents, affirms that "[i]t is also clear that the education now offered in many of the poor communities, including the communities in which the plaintiffs attend school, is inadequate."

The parties have stipulated to the opinions of the superintendents of four of the plaintiffs' districts, which describe in some detail the Commonwealth's failure to educate the children in those districts. The parties have stipulated that the conditions in these schools are "typical" of the schools in the other twelve communities in which plaintiffs attend school. The superintendent in Brockton is of the opinion that "the

[89]We have recited these relevant facts, *supra* at 552-555, and hence more briefly restate them here.

[90]The board's report appears to draw its information from a number of schools in the Commonwealth, including at least three districts (Brockton, Holyoke, Lawrence) in which some plaintiffs attend school.

Brockton Public Schools are unable to provide the programs, services and personnel that are necessary to meet the needs of its students"; that "Brockton is not adequately teaching its students to read"; that "shortcomings in the history and social studies programs in the Brockton public schools . . . have severely undercut the system's capacity to educate its students to understand the society in which they live and to help students become enlightened participants in the democratic process as they become adults."

The superintendent of the Leicester public schools states that "the Leicester public school system does not provide an adequate education to its students"; that class sizes in the third, fourth, and fifth grades in Leicester are "too large to provide the amount of individual attention and instruction needed by elementary students"; that guidance services in the schools "are inadequate and seriously jeopardize the future of [Leicester's] students"; that administrative support and management are "inadequate"; and that "most of the Leicester schools are in a terrible condition and that the high school is an extremely unsafe building."

The superintendent of the Lowell public schools states that class sizes in Lowell are "too large for teachers to be effective with elementary level students"; that the "low level of guidance offered in the Lowell public schools is inadequate to meet the needs of even an average suburban system, let alone the extreme needs of a system such as Lowell, with its unusually diverse population and large percentage of at-risk students."

Lastly, the parties stipulated that the superintendent of the Winchendon public schools is of the opinion that Winchendon "tends to end up with inexperienced and poor quality teachers"; that "there are not enough offerings for advanced students"; that "the science facilities are also poor, the textbooks are outdated and the middle school labs antiquated" and that "Winchendon is unable to provide an adequate science education for today's world to its students."

The parties have stipulated that students in the plaintiffs' districts are offered "significantly fewer educational opportu-

nities and lower educational quality than" students in the schools in the "comparison" districts of Brookline, Concord, and Wellesley. The stipulations outline specific deficiencies in the plaintiffs' schools, such as: large classes; reductions in staff; inadequate teaching of basic subjects including reading, writing, science, social studies, mathematics, computers, and other areas; neglected libraries; inability to attract and retain high quality teachers; lack of teacher training; lack of curriculum development; lack of predictable funding; administrative reductions; and inadequate guidance counseling.

In contrast, the comparison districts are able to offer "significantly greater educational opportunities," including: multi-faceted reading programs; extensive writing programs and resources; thorough computer instruction; active curriculum development and review ensuring comprehensive and up-to-date curriculum; extensive teacher training and development; comprehensive student services; and a wide variety of courses in visual and performing arts. In short, the record indicates that these districts are able to educate their children.

It is clear that c. 5, § 2, obligates the Commonwealth to educate *all* its children. The bleak portrait of the plaintiffs' schools and those they typify, painted in large part by the defendants' own statements and about which no lack of consensus has been shown, leads us to conclude that the Commonwealth has failed to fulfil its obligation.[91]

---

[91]Our conclusion that the Commonwealth is in violation of its constitutional duty to educate our children is not the first decision of its kind. The highest courts of some of our sister States have declared their educational systems to violate the education clauses, the equal protection provisions, or both clauses, of their Constitutions: *Dupree* v. *Alma Sch. Dist. No. 30 of Crawford County*, 279 Ark. 340 (1983); *Serrano* v. *Priest*, 18 Cal. 3d 728 (1976), cert. denied, 432 U.S. 907 (1977); *Horton* v. *Meskill*, 172 Conn. 615 (1977); *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989); *Helena Elementary Sch. Dist.* v. *State*, 236 Mont. 44 (1989); *Abbott* v. *Burke*, 119 N.J. 287 (1990); *Robinson* v. *Cahill*, 62 N.J. 473 (1973); *Edgewood Indep. Sch. Dist.* v. *Kirby*, 777 S.W.2d 391 (Tex. 1989); *Seattle Sch. Dist. No. 1.* v. *State*, 90 Wash. 2d 476 (1978); *Washakie County Sch. Dist.* v. *Herschler*, 606 P.2d 310 (Wyo.), cert. denied sub nom. *Hot Springs County Sch. Dist. No. 1* v. *Washakie County*

## C.

The crux of the Commonwealth's duty lies in its obligation to educate all of its children. As has been done by the courts of some of our sister States, we shall articulate broad guidelines and assume that the Commonwealth will fulfil its duty to remedy the constitutional violations that we have identified. The guidelines set forth by the Supreme Court of Kentucky fairly reflect our view of the matter and are consistent with the judicial pronouncements found in other decisions. An educated child must possess "at least the seven following capabilities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job

---

*Sch. Dist. No. 1*, 449 U.S. 824 (1980). While we do not undertake a comprehensive review of these cases, we note that several decisions relied on constitutional language and history less explicit than ours. See, e.g., *Robinson, supra*; *Rose, supra*.

For decisions of State Supreme Courts that have upheld their educational systems against constitutional challenges, see, e.g., *Shofstall* v. *Hollins*, 110 Ariz. 88 (1973); *Knowles* v. *State Bd. of Educ.*, 219 Kan. 271 (1976); *Hornbeck* v. *Somerset County Bd. of Educ.*, 295 Md. 597 (1983); *Milliken* v. *Green*, 390 Mich. 389 (1973); *Board of Educ., Levittown Union Free Sch. Dist.* v. *Nyquist*, 57 N.Y.2d 27 (1982), appeal dismissed, 459 U.S. 1138, 1139 (1983); *Board of Educ. of the City Sch. Dist. of Cincinnati* v. *Walter*, 58 Ohio St. 2d 368 (1979); *Danson* v. *Casey*, 484 Pa. 415 (1979); *Kukor* v. *Grover*, 148 Wis. 2d 469 (1989).

market." *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989).[92]

These guidelines accord with our Constitution's emphasis on educating our children to become free citizens on whom the Commonwealth may rely to meet its needs and to further its interests. As Horace Mann, the first secretary of the Board of Education, stated many years ago: "In regard to the application of this principle of natural law, — that is, in regard to the extent of the education to be provided for all, at the public expense, — some differences of opinion may fairly exist, under different political organizations; but under our republican government, it seems clear that the minimum of this education can never be less than such as is sufficient to qualify each citizen for the civil and social duties he will

---

[92]The precise nature of the remedy prescribed by the courts of our sister States that have declared their educational systems unconstitutional varied with the facts presented and the relevant constitutional provisions. Ultimately, however, these courts left the task of defining the specifics of their State's educational systems to their legislative and administrative bodies. For example, the Supreme Court of Washington declared specific portions of that State's education funding scheme unconstitutional and went on to declare broad guidelines with respect to the nature of the State's constitutional duty to educate children. Nonetheless, the Washington court made clear that the legislative branch had the responsibility to "define and give substantive content" to education. See *Seattle Sch. Dist. No. 1, supra.* Similarly, the Supreme Court of Texas held that that State's Constitution "does not allow concentrations of resources in property-rich school districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards [of education] . . . . [D]istricts must have substantially equal access to similar revenues per pupil at similar levels of tax effort." *Edgewood Indep. Sch. Dist., supra* at 397. In spite of this relatively specific holding, the Texas court declared that it did not "instruct the legislature as to the specifics of the legislation it should enact; nor do we order it to raise taxes. The legislature has primary responsibility to decide how best to achieve an efficient system. We decide only the nature of the constitutional mandate and whether that mandate has been met." *Id.* at 399.

As did these courts, we have declared today the nature of the Commonwealth's duty to educate its children. We have concluded the current state of affairs falls short of the constitutional mandate. We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education.

.

be called to discharge;— such an education as teaches the individual the great laws of bodily health; as qualifies for the fulfilment of parental duties; as is indispensable for the civil functions of a witness or a juror; as is necessary for the voter in municipal and in national affairs; and finally, as is requisite for the faithful and conscientious discharge of all those duties which devolve upon the inheritor of a portion of the sovereignty of this great republic." The Massachusetts System of Common Schools: Tenth Annual Report of the Massachusetts Board of Education 17 (1849).

The content of the duty to educate which the Constitution places on the Commonwealth necessarily will evolve together with our society. Our Constitution, and its education clause, must be interpreted "in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning." *Seattle Sch. Dist. No.1* v. *State*, 90 Wash. 2d 476, 516 (1978). Justice Holmes aptly captured this principle of constitutional jurisprudence:

> "[W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago."

*Missouri* v. *Holland*, 252 U.S. 416, 443 (1920).

Thus, we leave it to the magistrates and the Legislatures to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children today, and in the future.

## V

These cases are remanded to the county court for entry of a judgment declaring that the provisions of Part II, c. 5, § 2, of the Massachusetts Constitution impose an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live. It shall be declared also that the constitutional duty is not being currently fulfilled by the Commonwealth. Additionally, while local governments may be required, in part, to support public schools, it is the responsibility of the Commonwealth to take such steps as may be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate. No present statutory enactment is to be declared unconstitutional, but the single justice may, in his or her discretion, retain jurisdiction to determine whether, within a reasonable time, appropriate legislative action has been taken.

*So ordered.*

O'CONNOR, J. (concurring in part and dissenting in part). I agree with the court that "the Commonwealth has a duty to provide an education for *all* its children, rich and poor, in every city and town of the Commonwealth at the public school level, and that this duty is designed not only to serve the interests of the children, but, more fundamentally, to prepare them to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts" (emphasis in original). *Ante* at 606. I also agree that an educational program that is reasonably calculated to provide the children of the Commonwealth with the capabilities set forth in the Supreme Court of Kentucky's guidelines (*Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 [Ky. 1989]), would

satisfy the constitutional mandate. *Ante* at 618-619. I do not agree, however, that the record establishes that the Commonwealth has failed to provide public education in keeping with those guidelines. Therefore, I do not agree that the plaintiffs have proved that the defendants have violated the plaintiffs' constitutional entitlement to an education.

In support of its conclusion that children in the Commonwealth's less affluent communities or parts of communities are not receiving the education to which they are constitutionally entitled, the court states that it "need look no further than the parties' stipulations and the record appendix." *Ante* at 614. Specifically, the court appears to rely on a 1991 report of the Board of Education, *ante* at 552, a 1991 report of the Massachusetts Business Alliance for Education, *ante* at 553, the affidavit of Harold Raynolds, former Commissioner of Education, the affidavit of Peter Finn, executive director of the Massachusetts Association of School Superintendents, and the affidavit of Rosanne Bacon, former president of the Massachusetts Teachers Association, *ante* at 553. In addition, it appears that the court relies on the parties' stipulation "to the opinions of the superintendents of four of the plaintiffs' districts." *Ante* at 615-616. The reports and affidavits identified by the court are contained in a joint appendix filed by the parties and they set forth the opinions of various individuals. For example, the court notes that the 1991 Board of Education Report of the Committee on Distressed School Systems and School Reform, speaks of a "state of emergency due to grossly inadequate financial support," and states that "[c]ertain classrooms simply warehouse children . . . with no effective education being provided." *Ante* at 615. The court also points to the affidavits of Harold Raynolds, Jr., and Peter Finn expressing the affiants' view that education in many poor communities is inadequate.

In deciding whether the plaintiffs have established that their constitutional rights have been violated, it is critically important to understand that (1) the opinions contained in the aforementioned reports and affidavits do not purport to employ the Supreme Court of Kentucky guidelines (*Rose,*

*supra*) or any other articulable standards of educational adequacy, and (2) the parties have not stipulated to the truth of any assertion or to the validity of any opinion stated in the reports and affidavits. The mere inclusion of those documents in a jointly filed appendix establishes nothing.

In addition to the aforementioned reports and affidavits, the court focuses on the opinions of four superintendents of schools. *Ante* at 615-616. The court states that "[t]he parties have stipulated to the opinions of the superintendents of four of the plaintiffs' districts, which describe in some detail the Commonwealth's failure to educate the children in those districts." *Ante* at 615. The court's opinion sets forth relevant portions of those opinions. The tenor of the superintendents' opinions is fairly illustrated by the stated views of the superintendent of the Brockton public schools that "the Brockton Public Schools are unable to provide the programs, services and personnel that are necessary to meet the needs of its students," and "Brockton is not adequately teaching its students to read." *Ante* at 616. Just as it is important to understand that the parties have not stipulated to the merit or validity of the opinions expressed in the reports and affidavits included in the joint appendix, it is also important to understand that, although the parties "have stipulated to the opinions of the superintendents of four of the plaintiffs' districts," as the court says, *ante* at 615, they have done so only in the sense that they have agreed that the stated opinions are indeed the four superintendents' opinions and the superintendents are competent to render them. The parties have not stipulated to the merit or correctness of the opinions. On the contrary, in a supplemental stipulation, the parties have expressly agreed that "there is no consensus among education experts as to what constitutes an adequate education." Therefore, whether standing alone or in conjunction with the reports and affidavits discussed by the court, the superintendents' opinions do not establish any constitutional violations.

The court states: "The parties have stipulated that students in the plaintiffs' districts are offered 'significantly fewer educational opportunities and lower educational quality than'

students in the 'comparison' districts of Brookline, Concord, and Wellesley. The stipulations outline specific deficiencies in the plaintiffs' schools, such as: large classes; reductions in staff; inadequate teaching of basic subjects including reading, writing, science, social studies, mathematics, computers, and other areas; neglected libraries; inability to attract and retain high quality teachers; lack of teacher training; lack of curriculum development; lack of predictable funding; administrative reductions; and inadequate guidance counseling." *Ante* at 616-617. If that passage is intended to say that the parties have agreed that, in the plaintiffs' schools, basic subjects such as reading, writing, science, social studies, mathematics, and others are "inadequately" taught, or that the teaching in those subjects does not comply with the Supreme Court of Kentucky guidelines or similar standards, I respectfully disagree with the court. The parties have not stipulated to those facts. Those facts have not been established, and it is of no constitutional significance that more educational opportunities are provided in wealthy communities than in poor ones. Therefore, I am unwilling to join the court insofar as it declares that the defendants or the Commonwealth have failed to fulfil their constitutional obligations.